# WESLEY MORRILL

*v.*

# WILLIAM H. COLEHOUR *et al.*

1. SPECIFIC PERFORMANCE—*not when contract is abandoned.* Where the legal title to land purchased is taken in the name of one of the purchasers, and he gives his written agreement to the others that they shall share in the net profits, and they afterwards verbally agree with him to abandon all claims they have, in consideration of being released from liability for the purchase money, they can not have the contract of purchase specifically enforced in equity.

2.  CONSIDERATION—*release from liability.* Where several parties are interested in a purchase and liable for the purchase money, an agreement on the part of one to pay the money yet due, is a sufficient consideration to support a contract, on the part of the others, to abandon and give up all their interest in the property purchased.

3.  LAND *as personalty—statute of frauds.* Where land is purchased by several for the purpose of sale and the acquisition of profits only, and not for permanent use, it will be regarded in equity as personal property among the partners in the speculation, and one of the parties may release his interest in the same verbally, and the same will not be within the Statute of Frauds.

4.  CONTRACT—*written one may be released verbally.* The rule seems to be well established, that the terms and conditions of a written contract, and even a covenant, may be dispensed with by a verbal agreement, founded upon a proper consideration, and the same may be set up as a bar to an action for its breach.

APPEAL from the Superior Court of Cook county; the Hon. S. M. MOORE, Judge, presiding.

Mr. ARTHUR D. RICH, for the appellant.

Messrs. GOUDY, CHANDLER & SKINNER, for the appellees.

Mr. JUSTICE WALKER delivered the opinion of the Court:

It is alleged in the bill, that about the 18th day of July, 1871, complainant, together with Francis M. Corby and Charles W. Colehour, after previously negotiating with the owners, Robert D., Harriet S., Sarah J. and Henry F. Clark, purchased the undivided half of a tract of land, for the sum of $100,000 as the purchase money; to be paid, a prior mortgage of $4000; cash in hand, $10,000; and the balance in five annual installments of $17,200 each, with annual interest at the rate of seven per cent per annum, to be secured by deed of trust; that the purchase was made, and the conveyance was made to Wm. H. Colehour, who gave his notes and a deed of trust on the property, to secure the deferred payments.

Before the purchase was made Hansbrangh called the attention of C. W. Colehour to the fact that this land was in the market. He proposed to take an interest in the purchase, and

asked Colehour to do likewise. Thereupon he called Corby's attention to the matter, who also brought it to Morrill's notice. It was necessary, to consummate the purchase, that $10,000 should be paid when the purchase was closed. Colehour did not have the money and hence applied to Corby to take an interest in the purchase and advance the money, but he was unable to do so, and he applied to Morrill to take an interest and furnish the money. Pending the negotiations, there were numerous conferences between C. W. Colehour, Corby and Morrill, but there was no final action in the matter until about the 1st of August, 1871. It is claimed, and there seems to be evidence to support it, that whilst these conferences were being held C. W. Colehour had contracted with the Clarks for the purchase of the land for his brother, Wm. H. Colehour, and they executed a deed to him for the land on the 18th day of July, 1871, and he gave a trust deed to Turner to secure the $86,000 of unpaid purchase money.

Afterwards, about the 1st of August, the Clarks demanded that the $10,000 be paid or the purchase abandoned. Hansbraugh had furnished half of that sum, and C. W. Colehour, Corby and Morrill agreed that Morrill should furnish the money, as the others did not have it, as he was expecting means from Vermont, and C. W. Colehour and Corby were to refund to him their equal proportions of the amount. Morrill procured the $5000 from a bank, on his and Corby's note, and on the 14th of August he paid $2500 on this note, and on the 25th of October, following, he paid the balance. In May, 1872, Corby gave his note for one-third of the amount, and C. W. Colehour a note for a similar amount. Corby paid his note, but Colehour did not pay his, but renewed it, and subsequently Morrill recovered a judgment thereon.

The $5000 thus borrowed from the bank was placed in the hands of C. W. Colehour, which, with the $5000 he had received from Hansbraugh, he paid to the Clarks, and the deeds, previously prepared, were exchanged. The negotiations for the sale and purchase seem to have been conducted, on the

part of the Clarks, by H. F. Clark, and for W. H. Colehour and the others, by C. W. Colehour.

After the payment of the $10,000, and the exchange of the papers, Wm. H. Colehour gave to Hansbraugh a paper stating that he had paid $5000, half of the cash payment, and as he, Colehour, should make sales, Hansbraugh was to have one-half of the profits. He, at the same time, executed and delivered this paper to the other parties:

"CHICAGO, ILL., *August* 1, 1871.

"Know all men by these presents, that F. M. Corby, Wesley Morrill and Chas. W. Colehour are, together, jointly and equally interested in one-half of the 406 acres of land situate in Hyde Park, Cook county, Illinois, this day, to-wit: July 18, 1871, bought of H. F. Clark and others, they having advanced one-half of the purchase money advanced, in cash, to-wit: $10,000, they paying $5000 for the purchase of the same; and it is hereby agreed, that out of the profits, if any, to be realized from the sale of said land, the said parties above jointly shall be entitled to and receive the one-half of the net profits from any sale of said land. Witness my hand and seal, this 1st day of August, A. D. 1871.

WILLIAM H. COLEHOUR." [SEAL.]

The fire of October, 1871, destroyed the deed of conveyance from the Clarks to Wm. H. Colehour, but it was subsequently restored. These facts seem to be established by the evidence, and have given rise to less dispute than others in the case. But the Colehours having denied that complainant has any interest in the property, or in the proceeds of the sale thereof, he filed his bill to establish his rights, and for an account of the proceeds of sales made by Wm. H. Colehour.

As a defense to the bill, defendants insist that complainant released and discharged W. H. Colehour from all liability under his agreement of August 1, 1871, to account for profits, or for any interest in the land thus purchased and held by him; and that, under the release by C. W. Colehour, Corby and appellant, Wm. H. Colehour acquired and became invested

with all interest in the land, and he had taken possession and improved it, thereby greatly enhancing its value.

Against this defense, it is urged that appellees have failed to prove that appellant ever agreed to release the trustee; that if such proof was made it is by verbal agreement, not in writing, without consideration, and it is void; that the possession was taken under the conveyance and for the use of the *cestuis que trust*, and not under any release from appellant, written or verbal; and that, under the fiduciary relation of Wm. H. Colehour, he could not be released or discharged from the trust by a mere verbal agreement.

On a hearing on bill, answer, replication, exhibits and proofs, the court below refused the relief sought and dismissed the bill, and complainant appeals, and assigns various errors.

It is insisted that the evidence fails to show that there was an agreement entered into by the two Colehours, Corby and appellant, about the first of May, 1872, or at any other time, to turn the purchase over to W. H. Colehour, and that the others would abandon all claim to the property or to any profits that might be realized from its sale, and that he would not look to them for purchase money. Both of the Colehours and Corby testify that the arrangement was made; but it is positively denied by appellant. We think the circumstances in evidence strongly tend to corroborate the evidence of appellees. Their evidence may not be as clear and precise in all of the circumstances and details as we might reasonably expect, yet they all agree and are positive that the arrangement was made. When it is remembered that the fire of October, 1871, was so disastrous to the property of the city; that it so greatly depressed property beyond but near the city; and when we see that appellant, according to his own statement, gave the matter but little attention; when he saw the property lie for such a length of time without being offered for sale; and then, when he must have seen the various improvements being constructed upon it, and be content himself with only calling a few times at Colehour's office, without seeing him, it has little of the appearances of ownership or claim of profits from sales.

The improvements were extensive, and could not but attract the attention of all persons claiming any interest in the property. It does not appear that appellant ever gave authority to improve the property, and if not, and he claimed any interest in the property, we may safely infer that it would have induced him to at once inquire why they were made, and that he would have been vigilant in making inquiry as to their object, and would not have contented himself simply by calling at Colehour's office, and not seeing him for such a length of time. It is almost incredible that he should have done so, if he considered himself as interested in the land. He does not say that he ever inquired at all about the improvements thus made. This is not the course usually pursued by persons so largely interested in property.

Again, it is manifest that all of these parties believed, or at least they feared, that they were liable for the payment of any portion of the purchase money that might not be realized by a sale of the property. The price was depressed and the prospect of loss was strong, if the deed of trust should be speedily foreclosed. This, then, formed a strong inducement to abandon the whole thing and sustain the loss of the $5000 in equal portions, if they could induce W. H. Colehour to assume the risk. Hence, so far from there being no motive to enter into the arrangement, we can see that there was a strong inducement.

Stress is laid upon the fact that written releases were not given or written indemnity taken if the arrangement was made. In the first place, the parties certainly feared they were liable for the unpaid purchase money, and they must have known that the liability, if it existed, was to the Clarks, the vendors, as well as to W. H. Colehour. They, of course, would not go to the Clarks to obtain releases when it seems, from the evidence, that they all desired that the vendors should not become acquainted with the fact that they had any connection with the transaction. They would, therefore, naturally avoid all effort to procure such a release from that source.

The record shows that Corby had the same interest as that of appellant, and he swears that he surrendered his claim at the same time and on the same agreement as did appellant; and, notwithstanding the vast rise in this property, he disclaimed all interest in it, and, against his interest, testifies that they both, at the same time and from the same motives, abandoned all claim to the property or the profits arising from its sale. These are circumstances strongly corroborating the testimony given by appellees.

It is urged, that as W. H. Colehour occupied the relation of trustee, he should have fully disclosed everything to appellant, affecting his interest in the trust property, when the agreement to abandon the arrangement was made. A careful examination of the evidence fails to show that Colehour had superior information to that of appellant, or that he wrongfully withheld anything. They were both of mature age and were business men. They were both on the ground and had been for a considerable time, and, so far as the record discloses, appellant had equal means of information, and may have had all that was possessed by Colehour. So far as we can see he was equally well informed and as capable of protecting his interest as was Colehour.

It is, however, urged that appellees have entered into a conspiracy to defraud appellant out of his interest in the property. There is no direct evidence to sustain such a supposition. Even the prospect of large gains is wanting on the part of Corby. Instead of his making a large sum, he, by his testimony, deprives himself of all possibility of ever participating in any profits arising from the transaction. Nor is it shown that he would otherwise derive any gains by uniting with the Colehours in defrauding appellant out of his interest, by perjury. No motive is shown which would render it in the slightest degree probable that he would enter into such a base and infamous scheme; and if he was so depraved as to do so without some powerful motive, his character would be so infamous that it would have been an easy matter to have shown that his evidence was wholly unworthy of belief. A man can not be-

come so depraved without the almost total loss of character. He is not shown to have been unfriendly with appellant, nor to have had any interest or other controlling motive to combine with the Colehours to perpetrate so base a wrong on appellant. We see nothing in the record to even raise such a suspicion. All of the facts considered, we think that it clearly appears the parties did make the arrangement.

It is urged that there was no consideration to support the contract to abandon the agreement, which had been manifested in writing; that it was but an unexecuted agreement for a voluntary gift, and that a court of equity will never execute and enforce such a gift.

The fact that the property had largely depreciated in value, to perhaps less than the sum still due on it, and the fear that W. H. Colehour could hold them liable, and also, that they might be liable to the Clarks for any loss that might be sustained from a sale of the lands, was the strong inducement to make the arrangement, and the agreement with W. H. Colehour that he would be responsible to the Clarks for the purchase money, and not look to them for any portion of it, was the consideration of the agreement. Nor does it matter that they did not procure an agreement from the Clarks of a similar character, as the promise they did receive was a sufficient consideration to support the agreement.

It is next contended that the agreement related to such an interest in the land as to be void under the Statute of Frauds, because there was no memorandum of it in writing signed by appellant.

The written agreement executed by W. H. Colehour only binds him to pay appellant and the others equal portions of the one half of the net profits arising from the sale of the lands. It in no event bound him to convey the land, nor can we imagine any state of facts that could arise under the agreement, that would require a court of equity to compel him to convey the land to them. Had he failed or refused to proceed to make sales as was contemplated by the parties, he could, no doubt, have been compelled to do so, or another would have

40—82D ILL.

been appointed for the purpose, by a decree of court. By this agreement, this was not an interest in or title to the land, but it was an agreement to give appellant, and pay to him, profits that might be realized from the sale of the land.

W. H. Colehour held the legal title, the Clarks held the equitable title, or rather a lien on the land to secure the purchase money, and appellant and his associates held an agreement for one half of the net profits arising from the sale after discharging the $4000 mortgage, the purchase money, the expenses, taxes, and paying W. H. Colehour for his trouble.

It was not in the contemplation of any of the parties that W. H. Colehour should ever convey a foot of this land to them or either of them. The purchase was made for the purpose of sale and the acquisition of profits. It was not bought to hold as land, but simply as an article of commerce, and for speculation, and for that reason equity regards it as personal property among the partners. In such cases the intention of the parties stamps the character of the transaction. We are, for these reasons, of opinion that this was not a contract for such an interest in lands as to fall within the Statute of Frauds, and was not, therefore, void, because it was not in writing.

The rule seems to be well established that the terms and conditions of a written contract, and even a covenant, may be dispensed with by a verbal agreement founded upon a proper consideration. A formal release must, of course, be in writing, and under seal, but a verbal agreement to dispense with the performance of a written agreement, may be set up as a bar to an action for its breach. See Brown on Frauds, sec. 429, *et seq.*, *Gross* v. *Lord Nugent*, 5 Barn. & Adolph. 64, *Bell* v. *Howard*, 9 Mod. 302, and *Stephens* v. *Cooper*, 1 Johns. Ch. R. 49. These cases hold that, where a party sues to have a contract specifically performed. the defendant may prove that the contract was abandoned by a verbal agreement, and this is upon the principle that the court will never decree that a contract be performed when, to do so, it would be inequitable or oppressive.

Now this bill is, in effect, for a specific performance of the

contract of W. H. Colehour of the date of August 1, 1871, and the defense is, that the agreement was waived and discharged, and we think the waiver may be shown, as it was done, by a verbal agreement. Whether such a waiver or discharge can be relied upon as a defense in all cases, both at law and in equity, it is unnecessary at present to inquire, but that it may, in all cases for the specific performance of contracts and bills of that nature, we have no doubt.

For the reasons here given, we are clearly of opinion the decree of the court below dismissing the bill must be affirmed. We have, on a rehearing of this case, carefully reconsidered the grounds of the former decision of the case, and are unable to arrive at a different conclusion, and we must adhere to what we then said and determined.

*Decree affirmed.*