## UNITED STATES *v.* BROSNAN ET AL.

No. 137.   Argued March 21, 1960.—Decided June 13, 1960.*

---

*Together with No. 183, *Bank of America National Trust and Savings Association* v. *United States,* on certiorari to the United States Court of Appeals for the Ninth Circuit, argued March 22, 1960.

*Daniel M. Friedman* argued the causes for the United States. With him on the briefs were *Solicitor General Rankin, Assistant Attorney General Rice, A. F. Prescott* and *George F. Lynch.*

*William L. Jacob* argued the cause and filed a brief for respondents in No. 137.

*Samuel B. Stewart* argued the cause for petitioner in No. 183. With him on the brief were *Kenneth M. Johnson* and *Eldon C. Parr.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

In these two cases, the United States purports to hold federal tax liens on Pennsylvania and California real properties which are concededly junior to defaulted mortgages held on the same properties by the other parties to the suits. The basic issue in each case is whether the federal lien was effectively extinguished by state proceed-

ings to which the United States was not, nor was required under state law to be, a party.

The course of proceedings giving rise to this issue was as follows: In No. 137, involving a tract of Pennsylvania land, the respondent mortgagees, under a confession-of-judgment provision of the mortgage bond, obtained an *in personam* judgment against the mortgagor-taxpayer, pursuant to which the property was sold under a writ of *fieri facias.*[1]   Subsequently, the United States instituted this suit under 26 U. S. C. § 7403, seeking an enforcement of its tax lien by foreclosure and sale.[2]   The District Court held that the Government's lien on the property in question had been effectively extinguished by the Pennsylvania proceedings, and it entered judgment for the defendants. The Court of Appeals affirmed. 264 F. 2d 762.

In No. 183, California real and personal properties, subject to a deed of trust and two chattel mortgages, were sold by the trustee-mortgagee pursuant to powers of sale contained in the respective instruments. The United States received no actual notice of the sale.   Thereafter, the mortgagee, which had bought in at the sale, brought this suit against the Government under 28 U. S. C. § 2410 to quiet its title, claiming that the exercise of the powers of sale had effectively extinguished the federal tax lien. The Court of Appeals, reversing the District Court, dismissed the suit, holding that the federal lien could be

---

[1] Subsequent to the entry of judgment, but prior to the sale, the mortgagees attempted to join the United States as a party under 28 U. S. C. § 2410.   We agree with the District Court that that attempt did not comply with the statute.

[2] Alternatively, in the event the District Court found that the Government had been properly joined as a party to the state proceedings, the Government sought a decree that it had properly exercised its right of redemption.   That issue is not pressed by the Government and is not before us.

divested "only with the consent of the United States and in the manner prescribed by Congress." 265 F. 2d 862, 869. The Court did not reach the question of the effect which California law purports to give to the exercise of the power of sale upon junior liens.

We brought the cases here, 361 U. S. 811, because of the importance of the issue in the administration of the tax laws and the conflict between the decisions of the Third and Ninth Circuits.

## I.

Federal tax liens are wholly creatures of federal statute. Detailed provisions govern their creation, continuance, validity, and release.[3] Consequently, matters directly affecting the nature or operation of such liens are federal questions, regardless of whether the federal statutory scheme specifically deals with them or not. See *Clearfield Trust Co.* v. *United States,* 318 U. S. 363. Yet because federal liens intrude upon relationships traditionally governed by state law, it is inevitable that the Court, in developing the federal law defining the incidents of such liens, should often be called upon to determine whether, as a matter of federal policy, local policy should be adopted as the governing federal law, or whether a uniform nationwide federal rule should be formulated.

In determining the extent of the "property and rights to property" (§ 6321) to which a government tax lien attaches, we have looked to state law. *United States* v. *Bess,* 357 U. S. 51, 55. The mortgagees claim that the present cases are governed by the principle of *Bess.* They assert that since the taxpayer-mortgagors' interests were subject to being terminated by means of the state pro-

---

[3] See 26 U. S. C. § 6321 (Lien for taxes); § 6322 (Period of lien); § 6323 (Validity against mortgagees, pledgees, purchasers, and judgment creditors); and § 6325 (Release of lien or partial discharge of property).

ceedings here invoked, their "property and rights to property" were limited to that extent; that under *Bess,* the Government's lien attaches only to property rights created under state law; and that therefore, the Government's interest was subject to being similarly terminated.

The fallacy of this contention is evident. In *Bess,* we held that a deceased's property in insurance policies on his own life was limited to their cash surrender value and did not extend to their proceeds, which he could never enjoy. Here, however, the mortgagors owned the entire fee interests in the properties, subject only to the mortgages. This Court has repeatedly rejected the contention that because a fee owned by a taxpayer was already encumbered by a lien which enjoyed seniority under state law, the Government's lien necessarily attached subject to that lien.[4] *A fortiori,* the "property" to which the federal lien can attach is not diminished by the particular means of enforcement possessed by a competing lienor to whom federal law concedes priority.

## II.

We nevertheless believe it desirable to adopt as federal law state law governing divestiture of federal tax liens, except to the extent that Congress may have entered the field. It is true that such liens form part of the machinery for the collection of federal taxes, the objective of which is "uniformity, as far as may be." *United States* v. *Gilbert Associates,* 345 U. S. 361, 364. However, when Con-

---

[4] *United States* v. *Security Trust & Savings Bank,* 340 U. S. 47; *United States* v. *City of New Britain,* 347 U. S. 81; *United States* v. *Acri,* 348 U. S. 211; *United States* v. *Liverpool & London & Globe Ins. Co., Ltd.,* 348 U. S. 215; *United States* v. *Scovil,* 348 U. S. 218; *United States* v. *Colotta,* 350 U. S. 808; *United States* v. *White Bear Brewing Co.,* 350 U. S. 1010; *United States* v. *Vorreiter,* 355 U. S. 15; *United States* v. *Ball Construction Co., Inc.,* 355 U. S. 587; *United States* v. *Hulley,* 358 U. S. 66.

gress resorted to the use of liens, it came into an area of complex property relationships long since settled and regulated by state law. We believe that, so far as this Court is concerned, the need for uniformity in this instance is outweighed by the severe disclocation to local property relationships which would result from our disregarding state procedures. Long accepted nonjudicial means of enforcing private liens would be embarrassed, if not nullified where federal liens are involved, and many titles already secured by such means would be cast in doubt. We think it more harmonious with the tenets of our federal system and more consistent with what Congress has already done in this area, not to inject ourselves into the network of competing private property interests, by displacing well-established state procedures governing their enforcement, or superimposing on them a new federal rule. Cf. *Board of Comm'rs* v. *United States,* 308 U. S. 343.

### III.

This conclusion would not, of course, withstand a congressional direction to the contrary. The Government argues that by the enactment of certain statutes relating to judicial proceedings for the enforcement and extinguishment of federal liens, Congress has, at least impliedly, so spoken.

As early as 1868, Congress had authorized a suit by the United States to enforce its own tax lien.[5] A similar provision now appears as 26 U. S. C. § 7403.[6] However,

---

[5] Act of July 20, 1868, c. 186, § 106, 15 Stat. 167.

[6] "§ 7403. Action to enforce lien or to subject property to payment of tax.

"(a) *Filing.* In any case where there has been a refusal or neglect to pay any tax, or to discharge any liability in respect thereof, whether or not levy has been made, the Attorney General or his delegate, at the request of the Secretary or his delegate, may direct a civil action to be filed in a district court of the United States to enforce the lien of the United States under this title with respect to such

it was already then well established that the United States was an indispensable party to any suit affecting property in which it had an interest, and that such a suit was therefore a suit against the United States which could not be maintained without its consent.[7] Furthermore, the laws of many States themselves required all persons claiming an interest in property to be joined as parties to any suit to foreclose a lien or quiet title to the property. Thus there was no way in which a party who held a lien on property senior to that of the United States could get a judicial decree extinguishing the Government's interest.

To remedy this situation, Congress in 1924 passed the predecessor of 26 U. S. C. § 7424,[8] which gives the holder

tax or liability or to subject any property, of whatever nature, of the delinquent, or in which he has any right, title, or interest, to the payment of such tax or liability.

"(b) *Parties.* All persons having liens upon or claiming any interest in the property involved in such action shall be made parties thereto.

"(c) *Adjudication and decree.* The court shall, after the parties have been duly notified of the action, proceed to adjudicate all matters involved therein and finally determine the merits of all claims to and liens upon the property, and, in all cases where a claim or interest of the United States therein is established, may decree a sale of such property, by the proper officer of the court, and a distribution of the proceeds of such sales according to the findings of the court in respect to the interests of the parties and of the United States.

"(d) *Receivership.* In any such proceeding, at the instance of the United States, the court may appoint a receiver to enforce the lien, ·or, upon certification by the Secretary or his delegate during the pendency of such proceedings that it is in the public interest, may appoint a receiver with all the powers of a receiver in equity."

[7] *The Siren,* 7 Wall. 152; *Minnesota* v. *United States,* 305 U. S. 382, 386; *United States* v. *Alabama,* 313 U. S. 274, 282.

[8] 43 Stat. 253. Section 7424 now provides:

"§ 7424. Civil action to clear title to property.

"(a) *Obtaining leave to file.*

"(1) *Request for institution of proceedings by United States.* Any person having a lien upon or any interest in the property referred to in section 7403, notice of which has been duly filed of record in

of a prior-filed lien the right to enforce it by civil action against the United States, subject to the exhaustion of certain administrative remedies. The court is to proceed to "a final determination of all claims to or liens upon the property in question" in the same manner as if the action had been brought by the Government to enforce its lien under § 7403. The latter section requires the court to determine the merits of all claims to the property, and in case the United States establishes such a claim, permits, but does not require, the court to order a judicial sale. The details of the procedure to be followed in case of judicial sale are not specified, nor is the United States expressly given any right to redeem.

In 1931, Congress, for similar reasons, passed the predecessor of 28 U. S. C. § 2410, which gives a private lienor

the jurisdiction in which the property is located, prior to the filing of notice of the lien of the United States as provided in section 6323, or any person purchasing the property at a sale to satisfy such prior lien or interest, may make written request to the Secretary or his delegate to authorize the filing of a civil action as provided in section 7403.

"(2) *Petition to court.* If the Secretary or his delegate fails to authorize the filing of such civil action within 6 months after receipt of such written request, such person or purchaser may, after giving notice to the Secretary or his delegate, file a petition in the district court of the United States for the district in which the property is located, praying leave to file a civil action for a final determination of all claims to or liens upon the property in question.

"(3) *Court order.* After a full hearing in open court, the district court may in its discretion enter an order granting leave to file such civil action, in which the United States and all persons having liens upon or claiming any interest in the property shall be made parties.

"(b) *Adjudication.* Upon the filing of such civil action, the district court shall proceed to adjudicate the matters involved therein, in the same manner as in the case of civil actions filed under section 7403. For the purpose of such adjudication, the assessment of the tax upon which the lien of the United States is based shall be conclusively presumed to be valid."

the right to name the United States a party in any action or suit to foreclose a mortgage or lien or to quiet title to property on which the United States claims any kind of mortgage or lien, whether or not a tax lien.[9]   The action

---

[9] 46 Stat. 1528, as amended, 56 Stat. 1026. As presently codified, 28 U. S. C. § 2410 provides:

"§ 2410. Actions affecting property on which United States has lien.

"(a) Under the conditions prescribed in this section and section 1444 of this title for the protection of the United States, the United States may be named a party in any civil action or suit in any district court, or in any State court having jurisdiction of the subject matter, to quiet title to or for the foreclosure of a mortgage or other lien upon real or personal property on which the United States has or claims a mortgage or other lien.

"(b) The complaint shall set forth with particularity the nature of the interest or lien of the United States. In actions in the State courts service upon the United States shall be made by serving the process of the court with a copy of the complaint upon the United States attorney for the district in which the action is brought or upon an assistant United States attorney or clerical employee designated by the United States attorney in writing filed with the clerk of the court in which the action is brought and by sending copies of the process and complaint, by registered mail, to the Attorney General of the United States at Washington, District of Columbia. In such actions the United States may appear and answer, plead or demur within sixty days after such service or such further time as the court may allow.

"(c) A judicial sale in such action or suit shall have the same effect respecting the discharge of the property from liens and encumbrances held by the United States as may be provided with respect to such matters by the local law of the place where the property is situated. . . . Where a sale of real estate is made to satisfy a lien prior to that of the United States, the United States shall have one year from the date of sale within which to redeem. In any case where the debt owing the United States is due, the United States may ask, by way of affirmative relief, for the foreclosure of its own lien and where property is sold to satisfy a first lien held by the United States, the United States may bid at the sale such sum, not exceeding the amount of its claim with expenses

can be brought in a state court, but is removable to a federal court.[10]  If a judicial sale is conducted in such an action or suit, it is to have the same effect as it would have under local law, but the United States is given one year to redeem.

These statutes on their face evidence no intent to exclude otherwise available state procedures.  Their only apparent purpose is to lift the bar of sovereign immunity which had theretofore been considered to work a particular injustice on private lienors.  Several features of the statutes make this clear:

(1) Both sections are purely permissive in tenor.  A private lienor *"may* . . . file a petition in the district court" under § 7424, or "the United States *may* be named a party" under § 2410.   (Emphasis added.)

(2) Under neither section is there a federally imposed requirement that there be any judicial sale at all.  Nor is there any uniformity of procedure under the statutes.  Under § 7424, the court "may decree a sale" of the property, but no guidance is given as to the procedure to be followed.  Under § 2410, a judicial sale is to have the same effect as it would have under local law, but nothing in the section indicates when a judicial sale is to be had.  While the Government is guaranteed a one-year right to redeem if the plaintiff proceeds under § 2410, it is guaranteed no such right if he proceeds under § 7424.

(3) The specific permission of § 2410 (a) to institute a quiet-title suit against the United States obviously contemplates a declaration by the federal courts of previously created legal consequences.  If § 7424 or § 2410 were invoked to extinguish a federal lien, a subsequent suit to

---

of sale, as may be directed by the head of the department or agency of the United States which has charge of the administration of the laws in respect of which the claim of the United States arises."

[10] 28 U. S. C. § 1444.

quiet title obviously would not be necessary. Therefore, Congress must have recognized the possibility that state procedures might affect federal liens.

The Government, however, argues that the legislative history indicates that Congress believed a suit against the United States to be the only way in which a federal lien could be extinguished. But the statements relied on [11]

---

[11] The Senate Committee which reported the bill which became the predecessor of § 7424 stated (S. Rep. No. 398, 68th Cong., 1st Sess. 46):

"At the present time, in cases in which the lien prior in time to that of the United States equals or exceeds in amount the value of the property, there is no method whereby the lien for taxes may be discharged without payment. Although the lien may thus be value-less to the United States, it remains a cloud on the title which the prior lienor is powerless to remove. The subdivision gives the lienor a remedy in this case."

The House Committee which reported a bill designed to achieve the same objective as § 2410 stated (H. R. Rep. No. 95, 71st Cong., 2d Sess. 1–3):

"This legislation has been recommended for a number of years by the American Bar Association through its committee on removal of Government liens on real estate, the United States League of Local Building and Loan Associations, and by numerous land title companies, in order to relieve against the injustice with which mort-gagees are confronted under the present state of the law who find, when it is necessary to foreclose their mortgages, that there has been filed against the property a junior lien by the Federal Government for some debt due the United States by the owner of the equity in the property, and for which the mortgagee owes no obligation either legal or moral. In such circumstances, the mortgagee finds himself at an impasse. It is impossible for him to bring about a judicial sale of the property owing to the cloud upon the title created by the Government's lien. He can not remove the lien as there is no method by which he may bring the United States in as one of the parties to the foreclosure proceeding. He is, therefore, in effect defeated of his own right to foreclose unless he is willing to pay off the Government lien, a debt for which he is in no way responsible and he being a person to whom the Government would in no event look for its payment.

reveal simply a recognition that competing lienors were put at an unfair disadvantage because of inability to join effectively the Government as a party to judicial proceedings. As to the extent of that disadvantage, it is not

"The purpose of this bill is to provide a simple and just method of proceeding in such cases . . . .

.     .     .     .     .

"This bill will provide relief from a situation that has caused a. great deal of injustice to innocent holders of liens against real estate. The number of liens filed under the revenue laws has been steadily growing. . . . The law provides and equity dictates that the Government's lien in such circumstances should have a junior status, yet under the present practice the inability of the plaintiff to bring the United States in as a party to the proceeding to foreclose or have execution and sale on a court judgment where a Government lien is found to have been placed upon the property subsequently to the time of the plaintiff's encumbrance ties the hands of a prior lien holder by making it impossible for him to grant a clear title to the property and thus for no just reason deprives him of the benefits of his security or court judgment as the case may be."

During the debates leading to the enactment of the predecessor of § 2410, Representative Graham, who had reported the bill from the Judiciary Committee, explained it as follows (72 Cong. Rec. 3119):

"It is simply a provision by which whenever a mortgagee, for instance, holding a mortgage upon real estate, finds that a lien to the Government has been filed . . . the owner of that mortgage may go into the State court and foreclose his mortgage, but this would do him no good unless he could get the United States made a party to the proceeding in some way so that the lien would be relieved on the part of the Government."

Subsequently, the following colloquy took place with respect to a provision of the bill which authorized administrative release of questionable or worthless federal liens (72 Cong. Rec. 3121–3122):

"Mr. BURTNESS [of North Dakota]. So that some of us may understand a little better the relief that is suggested simply as an administrative act and the cases to which it would apply. I understand, for instance, it would apply to a case of this sort: In many States foreclosure by advertisement is permitted, with the right of redemption. Assume that a prior lien is foreclosed, the Government has a junior lien, the time for redemption expires and the purchaser

clear whether Congress thought that the Government's sovereign immunity barred an attempt to affect a federal lien in any manner; that a nonjudicial procedure might be effective to divest federal liens but that state procedures

at the foreclosure sale of the prior lien gets title through the foreclosure proceedings under State laws. Presumably in a case of that sort the enforcibility of the Federal lien as a practical proposition has been wiped out, but it is still a cloud on the title. Now, in that sort of a case, could the administrative officers give relief under the amendment that is proposed without going into court in any way?

"Mr. HAWLEY [of Oregon]. If at any time they find as a matter of fact that the Government lien is valueless they are authorized to release that lien by the pending amendment.

"Mr. BURTNESS. And it may become valueless for several reasons, for instance, depreciation in the value of the property, the amount of prior liens foreclosed in legal proceedings, or anything else.

"Mr. GRAHAM [of Pennsylvania]. The foreclosure the gentleman speaks of could not possibly discharge the Government's lien.

"Mr. BURTNESS. I understand it would not be discharged, but, of course, the holder of the property would have been subrogated to the rights acquired under the foreclosure of the prior lien, I take it."

In 1941, Attorney General Jackson sent a letter to the Chairman of the Senate Judiciary Committee urging that the predecessor of § 2410 be amended to include suits to quiet title. The letter stated (S. Rep. No. 1646, 77th Cong., 2d Sess. 2):

"It should be observed in this connection that under existing law there is no provision whereby the owner of real estate may clear his title to such real estate of the cloud of a Government mortgage or lien. *Welch* v. *Hamilton* (S. D. Calif.), 33 F. (2d) 224, and *U. S.* v. *Turner* (C. C. A. 8), 47 F. (2d) 86.

"In many instances persons acting in good faith have purchased real estate without knowledge of the Government lien or in the belief that the lien had been extinguished. In other instances, mortgagees have foreclosed on property and have failed to join the United States. It appears that justice and fair dealing would require that a method be provided to clear real-estate titles of questionable or valueless Government liens. Accordingly, I suggest that the bill be amended by inserting the phrase 'to quiet title or' between the words 'matter' and 'for the foreclosure of' in line 4 of page 2 of the bill."

by and large required junior lienors to be joined as parties to judicial proceedings; or that regardless of the existence and effectiveness of state procedures, a cloud on the title could only be removed conclusively by a judicial determination binding on the United States. In any event, the basic question is not what the existing state of the law was, or even what Congress believed it to be, but whether Congress intended to exclude the application of all state procedures, whatever their existence or effectiveness might be. No such inference can be drawn from the legislative statements referred to.

## IV.

The question remains whether the state procedures followed in these cases were nonetheless ineffective to defeat the government liens because they should be regarded as being unconsented suits against the United States. Because no judicial proceeding was there involved, No. 183 presents no such problem, unless we are now to hold, beyond anything this Court has heretofore decided, that because the private sale of its own force was effective under California law to extinguish all junior liens,[12] what was done in this instance amounted to a "suit" against the United States. We do not think that the doctrine of sovereign immunity reaches so far.

No. 137, however, presents a different and more difficult question on this score. Under Pennsylvania law the Sheriff's sale of the mortgaged land under a writ of *fieri facias* was a judicial sale, having the effect of extinguishing junior liens even though their holders were not, nor required to be made, parties to the proceedings.[13] Under

[12] Cal. Civ. Code § 2932; *Bracey* v. *Gray*, 49 Cal. App. 2d 274, 121 P. 2d 770; *Sohn* v. *California Pac. Title Ins. Co.*, 124 Cal. App. 2d 757, 269 P. 2d 223; 34 Cal. Jur. 2d, Mortgages and Trust Deeds § 463.

[13] Purdon's Pa. Stat. Ann., Tit. 12, § 2447; *Liss* v. *Medary Homes, Inc.*, 388 Pa. 139, 130 A. 2d 137; *State College Borough* v. *Leathers*,

the decisions of this Court, a judicial proceeding against property in which the Government has an interest is a suit against the United States which cannot be maintained without its consent. *The Siren,* 7 Wall. 152; *Minnesota v. United States,* 305 U. S. 382; *United States v. Alabama,* 313 U. S. 274. It has been suggested that this principle applies only where the Government holds a fee interest or such other interest in the property as to render it an indispensable party under state law. See *United States v. Cless,* 254 F. 2d 590, 592. That, however, seems a dubious distinction, since whether or not the United States is an indispensable party to a judicial proceeding cannot depend on state law. See *Minnesota v. United States, supra,* at p. 386. Nevertheless, no case in this Court, so far as we can find, has yet applied the doctrine of sovereign immunity in the precise situation before us. Much can be said for the view that this Pennsylvania procedure should not be considered as being an unconsented suit against the United States,[14] any more than the wholly private proceeding in the California case. In both cases, the practical effect upon junior liens is exactly the same.

Be that as it may, we shall not so extend the principle of sovereign immunity. To do so would not only produce incongruous results as between these two cases, but would trespass upon the considerations which have led to our refusal to fashion a federal rule of uniformity respecting the extinguishment of federal junior liens under state procedures. It must be recognized that the factors supporting a federal rule of uniformity in this field, and those

---

19 Pa. D. & C. 405; *Moore v. Schell,* 99 Pa. Super. 81; Standard Pennsylvania Practice, c. 68, § 32. See also *Commonwealth v. Keystone Graphite Co.,* 257 Pa. 249, 101 A. 766; Standard Pennsylvania Practice, c. 68, § 4, n. 20.

[14] If state procedures undertook to discriminate against the United States with respect to joinder, questions of a different order would be presented.

militating against the dislocation of long-standing state procedures, are full of competing considerations. They involve many imponderables which this Court is ill-equipped to assess, on which Congress has not yet spoken, and which we think are best left to that body to deal with in light of their full illumination. A wise solution of such a far-reaching problem cannot be achieved within the confines of a lawsuit. Until Congress otherwise determines, we think that state law is effective to divest government junior liens in cases such as these.

The judgment in No. 137 is affirmed, and that in No. 183 is reversed.

*It is so ordered.*

Mr. Justice Clark, whom The Chief Justice, Mr. Justice Black and Mr. Justice Frankfurter join, dissenting.

I submit that the over-all purpose of Congress in the adoption of § 2410 and § 7424 was "to afford to a holder of a lien prior in time to that of the United States . . . a method of procedure for clearing the title to the property."[1] The Committee pointed out that "there is no method whereby the lien for taxes may be discharged without payment. Although the lien may . . . be valueless to the United States, it remains a cloud on the title which the prior lienor is powerless to remove." And the House Committee stated, among other things, that real estate interests had recommended the legislation for years because a prior recorded lienholder was "in effect defeated of his own right to foreclose" and that the "simple and just method of proceeding" under the bill "is fair to the holder of the prior lien on the real estate and . . . amply and fully protects the rights of the Federal Government. . . ."

---

[1] For the sake of brevity, see note 11, pp. 247–249, of the majority opinion for references to, and citations of authorities for, these quotations.

It declared that "equity dictates that the Government's lien in such circumstances should have a junior status, yet under *the present practice* the inability of the plaintiff to bring the United States in as a party to the proceeding to foreclose or *have execution and sale on a court judgment* . . . ties the hands of a prior lien holder by making it impossible for him to grant a clear title to the property and thus . . . *deprives him of the benefits of his security* or *court judgment* as the case may be." (Italics added.) Furthermore, the Congress understood and intended that foreclosure under state procedures—by court or private sale—without notice to the United States "could not possibly discharge the Government's lien." (Chairman Graham of the House Judiciary Committee, manager of the bill on the floor.)

The Congress first passed § 7424, which gave a mortgagee the right, after exhausting administrative remedies, to bring an action against the United States to test its lien. Thereafter in 1931 it enacted § 2410 which, without administrative remedies, permitted the United States to be named a party in a suit by a mortgagee for foreclosure of a prior mortgage lien on property or to quiet title. The Act gave consent to the filing of such actions "[u]nder the conditions prescribed," including a one-year right of redemption, all of which requirements the Congress found to be necessary "for the protection of the United States."

Nevertheless, the Court has brushed aside all of these protections and, without regard to the congressional mandate, has turned these acts into booby traps in which the Government has now been caught up by its own benevolence. Giving the California mortgagees in No. 183 a *carte blanche* to wipe out the Government's lien by summary action at a trustee's sale, without even giving the Government notice, the Court declares its extraordinary action to be in recognition "of long-standing state pro-

cedures." For the same reason, the Pennsylvania mortgagees in No. 137 are permitted to bring an action in the courts of that State and to foreclose the Government's lien without making it a party or giving it any notice whatsoever. All of this it does as "a matter of federal policy." But this is not all. The Court finds that the Pennsylvania proceeding was a judicial one culminating in a sale of property on which the United States had a lien and that "[u]nder the decisions of this Court, a judicial proceeding against property in which the Government has an interest is a suit against the United States which cannot be maintained without its consent." Yet, even though admittedly the Government has not so consented, the Court says that since "no case in this Court, so far as we can find, has yet applied the doctrine of sovereign immunity in the precise situation before us," it will not do so now. This is certainly less than a self-evident explanation for wiping out an interest of the Government without its authorized consent, but this anomalous ground for decision is followed by the bootstrap operation that "Pennsylvania procedure should not be considered as being an unconsented suit against the United States, any more than the wholly private proceeding in the California case."

The fact about it is that the Court presupposes, wholly apart from 28 U. S. C. § 2410 and 26 U. S. C. § 7424, that the "long-standing state procedures" applicable to the extinguishment of junior private liens apply equally to junior government ones. In the light of the fact that federal law with regard to the manner in which liens of the United States may be released or extinguished has been on the books in one form or another for over 90 years, this is indeed a violent assumption. Under federal law, a prior-filed lienholder has for some 30 years enjoyed three specific remedies that he may follow to secure the release or extinguishment of a junior government lien. First, he may apply to the Secretary of the Treasury or

his delegate to release the lien under § 6325 of the Internal Revenue Code.[2] Section 6325 authorizes that official (1) to execute a release when the liability is satisfied or has become legally unenforceable or upon the furnish-

---

[2] "SEC. 6325. RELEASE OF LIEN OR PARTIAL DISCHARGE OF PROPERTY.

"(a) *Release of Lien.*—Subject to such rules or regulations as the Secretary or his delegate may prescribe, the Secretary or his delegate may issue a certificate of release of any lien imposed with respect to any internal revenue tax if—

"(1) *Liability satisfied or unenforceable.*—The Secretary or his delegate finds that the liability for the amount assessed, together with all interest in respect thereof, has been fully satisfied, has become legally unenforceable, or, in the case of the estate tax imposed by chapter 11 or the gift tax imposed by chapter 12, has been fully satisfied or provided for; or

"(2) *Bond accepted.*—There is furnished to the Secretary or his delegate and accepted by him a bond that is conditioned upon the payment of the amount assessed, together with all interest in respect thereof, within the time prescribed by law (including any extension of such time), and that is in accordance with such requirements relating to terms, conditions, and form of the bond and sureties thereon, as may be specified by such rules or regulations.

"(b) *Partial Discharge of Property.*—

"(1) *Property double the amount of the liability.*—Subject to such rules or regulations as the Secretary or his delegate may prescribe, the Secretary or his delegate may issue a certificate of discharge of any part of the property subject to any lien imposed under this chapter if the Secretary or his delegate finds that the fair market value of that part of such property remaining subject to the lien is at least double the amount of the unsatisfied liability secured by such lien and the amount of all other liens upon such property which have priority to such lien.

"(2) *Part payment or interest of United States valueless.*—Subject to such rules or regulations as the Secretary or his delegate may prescribe, the Secretary or his delegate may issue a certificate of discharge of any part of the property subject to the lien if—

"(A) there is paid over to the Secretary or his delegate in part satisfaction of the liability secured by the lien an amount determined by the Secretary or his delegate, which shall not be less than the

ing of a bond conditioned on the payment of the amount of the lien, or (2) to execute a partial release of the property involved where such a discharge will not jeopardize the Government's interest. This provision, in itself, seems entirely adequate to protect moneylenders from suffering any injustice, but the Congress did not stop there. It gave such a lienholder two additional remedies. These alternative and additional methods are set out in 26 U. S. C. § 7424 and 28 U. S. C. § 2410.

Section 7424 grants the mortgagee the privilege of enforcing his prior-filed lien by civil action against the United States as provided in § 7403, which was originally passed in 1868 as a remedy available only to the Government. As a protection to the United States, § 7424 first requires that the mortgagee request the Secretary of the Treasury to authorize the filing of an action under § 7403. Upon the Secretary's failure to authorize such an action within six months, the mortgagee may apply to the District Court for relief. Notice to all lienholders, including the United States, is required. The majority opinion emphasizes that no redemption right is given the Government in a proceeding under § 7424 and seems to place some reliance for its action on the absence of such relief. However, this policy of the Congress is entirely understandable

---

value, as determined by the Secretary or his delegate, of the interest of the United States in the part to be so discharged, or

"(B) the Secretary or his delegate determines at any time that the interest of the United States in the part to be so discharged has no value.

In determining the value of the interest of the United States in the part to be so discharged, the Secretary or his delegate shall give consideration to the fair market value of such part and to such liens thereon as have priority to the lien of the United States.

"(c) *Effect of Certificate of Release or Partial Discharge.*—A certificate of release or of partial discharge issued under this section shall be held conclusive that the lien upon the property covered by the certificate is extinguished." 68A Stat. 781, 26 U. S. C. § 6325.

when we consider that § 7424 first requires application to the Secretary. This requirement gives that official ample time before suit is filed to pay off the prior lien if advantageous to the Government. This is, of course, tantamount to a full redemption right after sale. There would be no point in permitting such relief after suit when its equivalent was available to the Secretary for six months during the time when he was considering the mortgagee's request.

In addition to this procedure, the Congress in § 2410 gave the mortgagee an additional and separate method by which to proceed. It does not require a request to be filed with the Secretary but permits the immediate invocation of judicial remedies in state or federal courts. Its relief extends to any type of mortgage or lien claimed by the United States, whether or not for taxes. The United States, of course, must be made a party and given notice. Judicial sales may be ordered, having the same effect as they would under state law, and the United States is given one year in which to redeem. Obviously this provision was inserted to protect the Government. Unlike a § 7424 proceeding, it ordinarily has received no notice of the prior mortgage lien before the mortgagee files suit. The Congress, in fairness to the Government, gave it one year after the judgment to reimburse the lienholder and redeem the property in protection of the Government's interest.

Now let us take up *seriatim* the grounds on which the Court disregards this carefully devised scheme for protecting the Government's liens. It says that certain "features" of the acts make "clear" that the federal remedies are not exclusive. The first two features have to do with the use by the Congress of the word "may" in granting permission to file the suit and the phrase the court "may decree a sale" in dealing with the action to be taken in the same. But statutory interpretation must not be reduced

to an exercise in semantology. In stating that a mortgagee "may . . . file a petition" Congress did not—because it could not—require him to do so. He "may" file suit if he wishes or he can take his chances that his title is superior, as thousands have in such matters. Likewise, in granting the privilege that "the United States *may* be named a party" the Congress employed the word "may" in its ordinary, familiar usage and understanding. Congressional expression, after all, must not necessarily be of Addisonian diction. Reaching the Court's further objection to the word "may" in the congressional language that the court "may decree a sale," it is submitted in all logic that, since other relief is available in the suit, *i. e.,* receivership, quieting of title, *et cetera,* Congress could use no other word. Certainly the word "shall" would be inapplicable. It was left up to the court to decree the appropriate relief after a full hearing and if a sale was in order to fix the manner, time and condition of the same. These are details the Congress appropriately and traditionally leaves to courts.

The third "feature" of which the majority makes much is the fact that the federal Acts do not "on their face" exclude state procedures. But this is a commonplace in federal legislation, *Hines* v. *Davidowitz,* 312 U. S. 52, 67 (1941), and is by no means the test. See *Pennsylvania* v. *Nelson,* 350 U. S. 497 (1956). The majority says that, since § 2410 (a) grants specific permission to file a quiet-title suit, this "contemplates a declaration by the federal courts of previously created legal consequences." This provision was suggested in 1941 by the then Attorney General Jackson. Being a practical lawyer with a large general practice, he knew that many titles were then clouded by government liens and that many times in the future "persons acting in good faith . . . without knowledge of the Government lien or in the belief that the lien had been extinguished" would likewise have no remedy

under which to clear their titles. This moved him to make the suggestion. But, being the lawyer he was, I am confident he never dreamed that his suggestion would strip the Government he was so capably representing of notice in private trustee sales and deprive it of any defense in such a quiet-title suit. Such a construction of this clause in § 2410 (a) acts as a repealer of all other provisions of these federal statutes. Why would the Congress give its consent to sue the United States as a *quid pro quo* of the Government having a fair chance to test out the validity of the prior-claimed private lien, and then turn right around and let the state procedure through a trustee's sale wipe out the government lien without notice, hearing or redemption rights? In this manner, action under state law wipes out federal procedure entirely— with the exception of the quiet-title suit and even in it the Government, according to the holding today, has none of the federal statutory protections. The trustee's deed under the deed of trust sale has, the Court says, extinguished the inferior government lien under state law and that is binding on the Government. It cannot contest the *bona fides* and priority of the deed of trust, the amount due under it, the regularity, fairness or validity of the exercised power of sale, or any other infirmities in the sale, including fraud or collusion—unless allowed by state law. To be able to construe a federal statute so as to wipe out the government lien, which on the face of the statute was to be tested on specific conditions written therein "for the protection of the United States," stretches the imagination for me beyond the breaking point.

Other than these "features" of the federal Acts, the "long-standing state procedures" and the "matter of federal policy," the Court gives no reason for adopting state procedures in extinguishing government liens. Of course, if, as the Court holds, the principle of sovereign immunity were not applicable, and if the Congress had not acted in

the field, the Court could "fashion the governing rule of law." *Clearfield Trust Co.* v. *United States,* 318 U. S. 363, 367 (1943). But the adoption of local law, even in that event, would be "singularly inappropriate." The tax liabilities involved here, as well as the liens securing the same, are all federally created and the rights arising therefrom would be governed by federal law. The enforcement of these rights, however, would be controlled by state law. Would this include the validity of the tax as assessed by the collector and asserted in the lien? While § 2410 and § 7424 do not permit the validity of the tax to be tested under their procedures, what about state law? Certainly this would open up endless problems. But be that as it may, the procedures of enforcement themselves would vary in each State, resulting in 50 separate and different rules of procedure, entailing varying interpretations, practices and pitfalls peculiar to each jurisdiction. Would it not be better to have a uniform system in the tax collection machinery of the Nation? In *Clearfield* the Court concluded that:

> "The issuance of commercial paper by the United States is on a vast scale and transactions in that paper from issuance to payment will commonly occur in several states. The application of state law, even without the conflict of laws rules of the forum, would subject the rights and duties of the United States to exceptional uncertainty. It would lead to great diversity in results by making identical transactions subject to the vagaries of the laws of the several states. The desirability of a uniform rule is plain." 318 U. S., at 367.

I submit that these grounds for uniformity so forcefully spelled out in *Clearfield* are even more compelling here where the revenue of the United States is imperiled. The importance of uniformity in tax procedures is well illus-

trated in *United States* v. *Gilbert Associates,* 345 U. S. 361, 364 (1953), where we again emphasized its necessity in these words:

> "A cardinal principle of Congress in its tax scheme is uniformity, as far as may be. Therefore, a 'judgment creditor' [as used in 26 U. S. C. (1946 ed.) § 3672] should have the same application in all the states."

It is the more important that, if moneylenders having prior-filed liens are to be given the right to extinguish inferior government liens, it be done on a uniform basis applicable equally in all of the States.

However, there is an even more serious objection to the adoption of state procedures in these cases. As we have seen, the Government is left without even the protection of notice. The United States' lien will be wiped out before its tax officials even know of the foreclosure under the prior-filed mortgage. It will be left without any protection. With thousands of trustees' sales going on over the country each day the Government's revenue will be seriously jeopardized.

While I would hold the federal procedures exclusive, if the Court insists that state law be made applicable would not a "just method of proceeding" at least include a rule that tax liens of the United States cannot be extinguished in any state proceeding—by trustee's sale or through judicial process—without giving the United States notice thereof? With all of its millions of tax transactions, how else can the public treasury be protected? Nor would such a requirement "inject ourselves into the network of competing private property interests" or displace "well-established state procedures governing their enforcement." The State could proceed as it wishes, within Fourteenth Amendment requirements, to set up and enforce its own procedures as to private lienholders.

Only in those cases where government liens are involved would lienholders have to give notice to the United States. This would protect the public revenue and cause no more hardship on moneylenders than they agreed to and have up until today had to bear under § 2410 and § 7424.

I would therefore reverse the judgment in No. 137 and affirm that in No. 183.