(No. 37093.—

CHICAGO FEDERAL SAVINGS AND LOAN ASSOCIATION, Appellee, *vs.* FRANK S. CACCIATORE *et al.,* Appellees.—(UNITED STATES OF AMERICA, Appellant.)

*Opinion filed September 28, 1962.*

William H. Avery, Walter J. Cummings, Jr., William H. Thigpen, and David H. Ward, (A. Edmund Peterson, Daniel S. Wentworth, J. Leonard Higley, and Sidley, Austin, Burgess & Smith, all of Chicago, of counsel,) for appellee.

Louis F. Oberdorfer, Assistant Attorney General, Lee A. Jackson and Joseph Kovner, Attorneys for the Department of Justice, all of Washington, D.C., (James P. O'Brien, United States Attorney, of counsel,) for appellant.

Mr. Justice Underwood delivered the opinion of the court:

On May 25, 1950, the Mutual National Bank of Chicago, as trustee under a trust agreement dated December 22, 1944, known as trust no. 1371, acquired title from one Jerry C. Lorenz and his wife to a single-family residence in Chicago. On March 8, 1957, Mutual National, as such trustee borrowed $28,500 from Chicago Federal Savings and Loan Association evidenced by its promissory note dated March 8, 1957, and secured by a mortgage and rent assignment on the real estate and acknowledged by an authorized officer

of the trustee on March 11, 1957, which mortgage and rent assignment were recorded March 15, 1957. On June 3, 1958, Mutual National as such trustee borrowed $10,000 evidenced by a note payable to bearer, and secured by a trust deed conveying the real estate to Chicago Title and Trust Company as trustee, acknowledged June 5, 1958, and recorded June 10, 1958. This trust deed was specifically subject to the Chicago Federal mortgage. On December 4, 1958, Mutual National as such trustee borrowed $4,535, evidenced by a note payable to bearer, and secured by a trust deed conveying the real estate to Chicago Title and Trust Company as trustee, dated December 4, 1958, and recorded December 17, 1958.

Default having been made in the payments due under the first mortgage, Chicago Federal filed its complaint to foreclose its mortgage on July 21, 1959, making parties defendant Mutual National as trustee under the land trust, Chicago Title and Trust Company as trustee under the second and third mortgages, Frank S. Cacciatore and Lucille M. Cacciatore, as being in possession of the premises and as beneficiaries under the Mutual National trust agreement of December 22, 1944, and numerous other defendants possibly having some interest as judgment creditors, lien claimants or the like, and unknown owners, including the owners of the bearer notes secured by the second and third mortgages. The United States of America was made a defendant as claiming some interest in the premises by virtue of a tax lien for $7,911.57 against Frank Cacciatore, notice of which lien was filed by the Collector of Internal Revenue with the Cook County recorder on July 29, 1957.

The United States of America filed its answer on August 18, 1959, denying its lien is inferior to the lien of Chicago Federal, and asking the court to determine the rights and priorities of the respective parties. Chicago Title and Trust Company as trustee under the second mortgage, and one David J. Peilet as owner of the note secured by the second

mortgage, answered admitting the priority of the Chicago Federal mortgage but alleging the second mortgage to be superior to all other claims. One Stephen L. Ruff was added as a party defendant as an assignee of the beneficial interest under the Mutual National trust. He answered admitting his ownership of the beneficial interest in Mutual National trust No. 1371. Thereafter, on October 28, 1959, all other defendants were either defaulted or dismissed, and the cause was referred to the master in chancery. On December 23, 1959, an amended complaint was filed adding additional defendants, none of whom are involved here. At the hearing before the master, all three notes and mortgages and the Federal tax lien were proved and admitted in evidence, and the master in his report found Ronald Wayne & Co., Inc., an Illinois corporation, to be the owner of the Chicago Federal note, mortgage and rent assignment by assignment of February 18, 1960, and Wayne & Co. was substituted as plaintiff.

On July 26, 1960, a decree of sale was entered by the circuit court of Cook County approving the master's report, overruling the exceptions to the report, and directing the sale of the premises by the master. The decree further found Wayne & Co. entitled to $38,903.49 for principal, (including $663 advanced for 1958 real-estate taxes), interest, attorneys' fees and court costs; Peilet, as owner of the second mortgage note, to be entitled to $12,426.64 for principal, interest, attorneys' fees and court costs, subject only to the prior rights of Wayne & Co.; Sam and Vita Dattulo as owners of the third mortgage note, to be entitled to $5,254.33 for principal, interest, attorneys' fees and court costs, subject only to the prior rights of Wayne & Co. and Peilet. The decree further found that Ruff had been the owner of the sole beneficial interest of the trust (Mutual National No. 1371) since December 19, 1958; "subject however to the interest of the United States of America, in said beneficial interest, in the sum of $4,826.31, plus interest at 6%

per annum from March 8, 1957, which interest of the United States had attached to the beneficial interest of the trust herein at the time of the recording of the federal tax lien on July 29, 1957, * * *." In default of payment, sale by the master was ordered of the mortgaged premises, all subject to the usual redemption provisions, including a specific provision giving the United States of America one year from the date of sale in which to redeem.

United States of America filed notice of appeal from this decree to the Appellate Court, First District, asking that its tax lien "be found and declared to be prior to the rights, claims and interests of all other claimants in this cause, save the holder of the first mortgage * * *." On September 16, 1960, an order was entered by the circuit court making the notice of appeal a *supersedeas* without bond and staying the execution of the terms of the decree of sale except as to the foreclosure of the first mortgage lien. Thereafter, on December 19, 1961, the Appellate Court affirmed the decree. The United States of America petitioned for leave to appeal to this court, and Peilet and Chicago Title and Trust Company, trustee under the second mortgage, answered the petition for leave to appeal by agreeing that the issues are important and merit review by us, and therefore we granted leave to appeal. No other parties to the litigation appear here.

An examination of the record indicates that the master proceeded to sell the premises to satisfy the lien of the first mortgage, and that the sale produced $2,454.92 after payment of the first mortgage indebtedness and costs. It would appear that this litigation resolves itself to the question of who gets the $2,454.92, it apparently being conceded that both the tax lien of the United States of America and the Peilet second mortgage note amount to more than that sum.

Since the balance of the proceeds of sale will satisfy neither the second mortgage debt nor the Federal tax lien in full, it is unnecessary for us to determine the relative

priority: of the third mortgage debt. and the Federal tax lien, as the point has become moot.

The government questions the payment of subsequently accrued taxes by the first mortgagee, the taxes being for a year subsequent to, and the payment being made subsequent to, the date of filing of the government lien. The government concedes that the first mortgage is prior to the governmental lien which was filed subsequent to the execution and recording of the first mortgage, and the mortgage instrument expressly provides for the payment of after accruing taxes. The rights of the beneficiary were necessarily subject to such after accrued taxes. Since payment of the taxes was made by the mortgagee pursuant to authority given it by the trustee prior to the date of the filing of the governmental lien, there can be no question regarding the propriety of such payment and the precedence thereof over the governmental lien. The beneficiary having previously directed the execution of the first mortgage, and the trustee having previously executed the first mortgage which authorized the mortgagee to make payment of such taxes in order to protect its security, no subsequent action could affect the authority of the mortgagee to make such payments and include the amount thereof in the total secured by the first mortage lien. *Wright* v. *Langley,* 36 Ill. 381; *Thackaberry* v. *Johnson,* 131 Ill. App. 463, affirmed 228 Ill. 149.

In addition to the foregoing reasons for holding the subsequently accrued and paid taxes prior to the government lien, there is an entirely separate and independent ground upon which such action may be sustained. The Appellate Court was clearly correct in denying the government's claim for priority over the tax advance on the independent ground that the Federal lien against the trust beneficiary did not attach to the real estate to which the beneficiary had no title under the law of this State as is hereinafter more clearly set forth.

As between the second mortgage of June 3, 1958, and the

Federal tax lien, notice of which lien was filed July 29, 1957, against Frank S. Cacciatore, the admitted beneficial owner under the Mutual National land trust until December 19, 1958, the question of priority is an important one, since it goes to the very heart of Illinois land trust transactions and the right of innocent third parties to deal with a land trustee either as purchasers or mortgagees lending upon the sole security of the trust real estate.

The tax lien notice was filed pursuant to sections 6321, 6322 and 6323 of the Internal Revenue Code of 1954 (26 U.S.C.A. 6321 *et seq.*). Section 6321 provides for a lien for unpaid Federal taxes in favor of the United States "upon all property and rights of property, whether real or personal, belonging to such person." Section 6322 provides the lien imposed by section 6321 shall arise at the time the assessment is made, and section 6323 provides the lien shall not be valid against any mortgagee, pledgee, purchaser or judgment creditor until notice is filed in the office designated by the law of the state in which the property subject to the lien is situated.

In *Aquilino* v. *United States,* 363 U.S. 509, 4 L. ed. 2d 1365, the court said (p. 512) : "The threshold question in this case, as in all cases where the Federal Government asserts its tax lien, is whether and to what extent the taxpayer had 'property' or 'rights to property' to which the tax lien could attach. In answering that question, both federal and state courts must look to state law, for it has long been the rule that 'in the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property   *   *·  * sought to be reached by the statute.' *Morgan* v. *Commissioner,* 309 U.S. 78, 82."

Only when the Federal tax lien has attached to the taxpayer's State-created interests, does the Federal law determine the priority of competing liens against the taxpayer's property or rights to property. *Aquilino* v. *United States,*

363 U.S. 509; *United States* v. *Bess,* 357 U.S. 51, 55, 2 L. ed. 2d 1135. So, in order to determine Cacciatore's "property" or "rights to property", we must look to the contractual documents of the trust in question.

The deed by which Mutual National as trustee took title to the real estate in 1950 provided in part: "The interest of each and every beneficiary hereunder and of all persons claiming under them or any of them shall be only in the earnings, avails and proceeds arising from the sale or other disposition of said real estate, and such interest is hereby declared to be personal property and no beneficiary hereunder shall have any title or interest, legal or equitable, in or to said real estate as such, but only an interest in the earnings, avails and proceeds thereof as aforesaid." It also contained the following:

"In no case shall any party dealing with said trustee in relation to said premises, or to whom said premises or any part thereof shall be conveyed, contracted to be sold, leased or mortgaged by said trustee, be obliged to see to the application of any purchase money, rent or money borrowed or advanced on said premises, or be obliged to see that the terms of this trust have been complied with, or be obliged to inquire into the necessity or expediency of any act of said trustee, or be obliged or privileged to inquire into any of the terms of said trust agreement; and every deed, trust deed, mortgage, lease or other instrument executed by said trustee in relation to said real estate shall be conclusive evidence in favor of every person relying upon or claiming under any such conveyance, lease or other instrument, (a) that at the time of the delivery thereof the trust created by this indenture and by said trust agreement was in full force and effect, (b) that such conveyance or other instrument was executed in accordance with the trusts, conditions and limitations contained in this indenture and in said trust agreement or in some amendment thereof and binding upon all beneficiaries thereunder, (c) that said trustee was duly

authorized and empowered to execute and deliver every such deed, trust deed, lease, mortgage or other instrument, and (d) if the conveyance is made to a successor or successors in trust, that each successor or successors in trust have been properly appointed and are fully vested with all the title, estate, rights, powers, authorities, duties and obligations of its, his or their predecessor in trust."

The trust agreement dated December 22, 1944, provides that Frank S. Cacciatore shall be entitled to "the earnings, avails and proceeds of said real estate" for and during the term of his natural life, and after his death "if any property still remains in this trust, then for the use and benefit of his wife, Lucille Cacciatore." It further provides that "the interest of any beneficiary shall consist solely of a power of direction to deal with the title to said property and to manage and control said property as hereinafter provided, and the right to receive the proceeds from rentals and from mortgages, sales or other disposition of said premises, and that such right in the avails of said property shall be deemed to be personal property, and may be assigned and transferred as such; * * *."

Both the trust agreement and the deed to the trustee contain clauses used for many years in the creation of an Illinois land trust. We have recognized the validity of such a procedure to place in the trustee the full, complete and exclusive title to the real estate, both legal and equitable. The trust here is an active trust, and Cacciatore's beneficial interest is personal property as distinguished from real estate by the terms of the recorded trust deed, the trust agreement itself, and by settled Illinois law. *Seno* v. *Franke*, 20 Ill.2d 70; *Chicago Title & Trust Co.* v. *Mercantile Bank*, 300 Ill. App. 329; *Morrill* v. *Colehour*, 82 Ill. 618.

The government contends that Peilet in dealing with the trust real estate was plainly on notice that it was trust property and hence was bound to look to the terms of the trust which would have disclosed the nature and identity

of the beneficial interest. The 1950 deed to the trustee also provides in part: "In no case shall any party dealing with the trustee in relation to said premises * * * be obliged or privileged to inquire into any of the terms of said trust agreement." Provisions of this type are neither contrary to law nor public policy, and are given effect as a means of enabling third parties to deal with real estate in reliance upon the record title of the land trustee. Large scale real estate developments by land trusts have been made possible only because the financing sources can rely upon the sole security of the trustee's title to the real estate. In this case the record title in Mutual National as trustee was clear and unencumbered excepting for the first mortgage. The loan by Peilet was made on the sole security of the real estate, and to hold that his failure to inquire into the identity and nature of the undisclosed beneficial interests, sacrifices his position as a second mortgagee, would severely dislocate or even destroy local property concepts and relationships.

The basic question here is not as to the nature of the beneficiaries' interest in the trust—this is concededly personal property—nor whether the lien of the government attaches to the real estate itself—concededly, it does not—nor is it as to whether the interest of the taxpayer can be subjected to the claims of his creditors—all parties agree that it can be, either by a creditor's bill, or other appropriate and timely proceedings. The crux of the case as we understand the government's position, is the contention that the lien attached to the rights of the beneficiary-taxpayer at the time the lien was filed. As of that date, July 29, 1957, no encumbrance existed upon the real estate in question with the exception of the first mortgage which the government concedes to be superior to its lien. At that time, pursuant to the provisions of the trust deed and the trust agreement, the taxpayer-beneficiary did have certain rights under the trust indenture, including the right to direct a conveyance of the real estate to himself at any time. Had this been

done at that point, the taxpayer-beneficiary would have received the real estate back subject only to the first mortgage and the lien of the government's tax claim which would have thereupon attached. The government, as we understand it, therefore now contends that since its lien attached to the rights of the taxpayer at that time, and the taxpayer had the right to regain the property subject only to the lien of the first mortgage, the government should therefore stand in the taxpayer's shoes, able at the present time to proceed against the real estate, subject only to the rights of the prior encumbrance as of July 29, 1957, to-wit: the first mortgage. We find no fault with this argument as it applies to the date of filing the lien, and the government could well have successfully pursued its remedies at that time. Since this was true, the government now contends that the taxpayer could not thereafter, by his voluntary action, diminish the government's position. The government took none of the steps provided for the seizure of personal property provided by the Internal Revenue Code of 1954, (26 U.S.C.A., section 6331 *et seq.*). By failing to do so, it placed itself in a position similar to where its lien is filed against a depositor in a bank. While the lien does attach to the depositor's rights in the account, in the absence of a levy a transfer of the account by check or otherwise to a third party who takes it in good faith and for a good consideration, gives to the transferee a claim superior to that of the government. (*United States* v. *O'Dell*, (6th cir.) 160 F.2d 304; *In re Holdsworth,* (D.C.N.J.) 113 F. Supp. 878; *United States* v. *Eiland,* (4th cir.) 223 F.2d 118.) We have before us a situation in which the rights of innocent parties, heretofore secure in an area of stable real-estate law, have intervened and require consideration. The good faith, innocence, and lack of actual notice or knowledge of the second mortgagee is not disputed on this record.

We now come to grips with the real problem in this case: Succinctly stated, it is: Are the exigencies of expeditious

revenue collections by the Federal government so extreme as to necessitate a drastic upheaval in real property concepts in this State? The government finds justification for its advocacy of this change in the "paramount claim of federal revenue." That the essential requirement for stability in real property concepts outweighs the need of the Federal government for uniform, expeditious revenue collection methods has been repeatedly recognized by the Federal courts. "We do not conceive it to be an appropriate exercise of the power and authority of a federal court to strike down a rule of property not repugnant to any law of the United States long established in the state, and upon which many valuable property rights are based." (*United States v. Hutcherson,* (8th cir.) 188 F.2d 326.) "Rules of property and fixing the incidents of property ownership are rules of state law which the federal courts will respect." (*United States* v. *American National Bank of Jacksonville,* (5th cir.) 255 F.2d 504, *certiorari* denied, 358 U.S. 835; *United States* v. *Brosnan,* 363 U.S. 237, 4 L. ed. 2d 1192, 80 Sup. Ct. 1108.) "However, when Congress resorted to the use of liens, it came into an area of complex property relationships long since settled and regulated by state law. We believe that, so far as this Court is concerned, the need for uniformity in this instance is outweighed by the severe dislocation to local property relationships which would result from our disregarding state procedures. Long accepted non-judicial means of enforcing private liens would be embarrassed, if not nullified where federal liens are involved, and many titles already secured by such means would be cast in doubt. We think it more harmonious with the tenets of our federal system and more consistent with what Congress has already done in this area, not to inject ourselves into the network of competing private property interests, by displacing well-established state procedures governing their enforcement, or superimposing on them a new

federal rule." *United States* v. *Brosnan,* 363 U.S. 237, 242, 4 L. ed. 2d 1192, 80 Sup. Ct. 1108.

The government relies heavily upon *United States* v. *Bess,* 357 U.S. 51, 2 L. ed. 1135, 78 Sup. Ct. 1054, in support of its position here. However, there are substantial differences which, in our judgment, make *Bess* readily distinguishable. In the first instance, the government's brief acknowledges that the proceedings in *Bess* consisted of a *creditor's bill* brought by the United States to recover from a beneficiary of life insurance policies the amount of Federal income taxes owed by insured at his death. It is conceded in the case at bar that a creditor's bill would have been appropriate if aptly timed. Secondly, the beneficiary of the insurance policies in *Bess* had taken no action prejudicial to herself in reliance upon State law—here we have an innocent mortgagee who has, in reliance upon the heretofore settled law of this State, disbursed his money upon the sole security of a mortgage from the trustee under a land trust. We cannot agree that this decision is any authority for the present position of the government.

The law of this State and the decisions of reviewing courts for more than 80 years have encouraged public reliance upon the real property concepts exemplified in the land trust now before us. Millions, and probably billions, of dollars have been and now are invested in similar trust arrangements and thousands of titles depend thereon for their validity. While we recognize the needs of the Federal revenue, and the desirability of uniform collection and enforcement methods in this area, we find ourselves in complete accord with the majority opinion in *United States* v. *Brosnan,* 363 U.S. 237, 4 L. ed. 2d 1192, 80 Sup. Ct. 1108, that such needs are "outweighed by the severe dislocation to local property relationships which would result from our disregarding state procedures." We therefore hold that the lien of the United States upon the rights of the trust bene-

ficiary is here subordinate to the subsequently accruing taxes paid pursuant to authority given in the first mortgage, and to the lien of the second mortgage, and that the circuit court and Appellate Court were correct in so deciding. The judgment is therefore affirmed.

*Judgment affirmed.*