UNITED STATES of America, Plaintiff,

v.

Osie DANSBY et al., Defendants.

Civ. A. No. C80–683A.

United States District Court,
N. D. Ohio, E. D.

March 3, 1981.

mortgage deed, declaration of a valid senior lien, foreclosure on the mortgage deed and judicial sale of the property, and a marshalling of all other liens after sale in the event the proceeds exceed the United States Marshal's costs, county real estate taxes, and the sum due the government. Defendant Credithrift of America, Inc. # 5 (Credithrift) counterclaims for a declaration that the government's interest has been extinguished as a junior lien by operation of a state judicial foreclosure action enforcing a county real estate tax lien.

The jurisdiction of this Court having been properly invoked pursuant to 28 U.S.C. § 1345, this cause came on for hearing on September 22, 1980. The following shall constitute the Court's findings of fact and conclusions of law as required under Rule 52(a), Federal Rules of Civil Procedure.

## I.

The material facts relevant to this dispute over a parcel of land located in Tuscarawas County, Ohio, and designated as parcel # 1484, are essentially uncontested. On March 26, 1971, defendants Osie and Lillian Dansby executed a promissory note evidencing their joint indebtedness to the United States Farmers Home Administration (FmHA), an agency of the federal government, in the amount of $16,750.00. The funds were made available in the form of a rural housing loan under Title V, section 502, of the Housing Act of 1949, 42 U.S.C. § 1472, and implementing regulations, see 7 C.F.R. § 1822.1 to .18 (1980). The Dansbys delivered to the FmHA a mortgage deed, which secured payment for the indebtedness and was duly filed with the Tuscarawas County Recorder. Since January, 1972, the Dansbys have been in default under the terms and conditions of both the promissory note and mortgage deed.

County real estate taxes began to accrue on the mortgaged parcel of land. The real estate taxes were certified as delinquent and created a lien in favor of the State of Ohio. See Ohio Rev.Code § 5721.01 to .13. Under Ohio law a state tax lien is senior to

John J. Horrigan, Asst. U. S. Atty., Cleveland, Ohio, for plaintiff.

Frank J. Rose, Jr., Scott J. Mastin, New Philadelphia, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

CONTIE, District Judge.

This matter is before the Court upon a foreclosure action brought by the United States of America. The government seeks judgment on a promissory note secured by a

all other encumbrances on the property. *See* Ohio Rev.Code § 5721.10.[1]

In May, 1978, the Tuscarawas County Treasurer commenced an *in rem* action, pursuant to Ohio Rev.Code § 5721.18(B),[2] to foreclose the state tax lien. Notice by publication was made as required by Ohio Rev. Code § 5721.18(B). This provision does not require that any other form of notice be given to lienholders. A common pleas court entered a default judgment, finding that the county had a valid senior tax lien in the amount prayed in the complaint and ordering a judicial sale of parcel # 1484 with the proceeds to be applied toward the delinquent tax lien. *See* Ohio Rev.Code §§ 5721(B)(2) and 5721.19. Although any person claiming an interest in the subject parcel may file an answer in the foreclosure proceeding, *id.*, the government did not appear in the action.

The sale was conducted by the Tuscarawas County Sheriff. The parcel was purchased by and a sheriff's deed was delivered to defendant Luther Cato, Jr. In Novem-

1. Section 5721.10 provides as follows:

    The state shall have the first lien on the lands and lots described in the delinquent land list, for the amount of taxes, assessments, and penalty charged prior to the delivery of such list. If the taxes have not been paid for one year after having been certified as delinquent, the state shall institute foreclosure proceedings in the manner provided by sections 5721.01 to 5721.28, inclusive, of the Revised Code, and there shall be taxed by the court, as costs in the foreclosure proceedings instituted on said certification, the cost of an abstract or certificate of title to the property described in said certification, if the same is required by the court, to be paid into the general fund of the county. Such sections do not prevent the partial payment of such delinquent taxes, assessments, and penalty during said period of one year, but such partial payments may be made and received as provided by law without prejudice to the right of the state to institute foreclosure proceedings at the end of said period for any amount then remaining unpaid.

2. Section 5721.18(B) provides in relevant part as follows:

    (B) Proceedings for foreclosure that are commenced by the filing of a complaint after the end of the third year from the date on which the delinquency was first certified by the county auditor constitute an action in rem. Such action shall be instituted by filing in the office of the clerk of a court of competent jurisdiction, a complaint bearing a caption substantially in the form set forth in section 5721.181 [5721.18.1] of the Revised Code. Any number of parcels may be joined in one action. Each separate parcel included in a complaint shall be given a serial number and shall be separately indexed and docketed by the clerk of court in a book kept by the clerk for such purpose. A complaint shall contain the permanent parcel number of each parcel included therein, the full street address of the parcel, when available, a description of the parcel, as set forth in the delinquent land tax certificate, the name and address of the last known owner of the parcel if the same appears on the general tax list, and the amount of taxes, assessments, penalties, and charges due and unpaid with respect to the parcel. It is sufficient for the treasurer to allege in his complaint that a delinquent land tax certificate has been duly filed by the county auditor with respect to each parcel listed and that the amount of money with respect to each parcel appearing to be due and unpaid is due and unpaid and a lien against such parcel without setting forth any other or special matters. The prayer of the complaint shall be that the court make an order that the land described in the complaint be sold in the manner provided in section 5721.19 of the Revised Code.

    (1) Within thirty days after the filing of a complaint, the clerk of court where such complaint was filed shall cause a notice of foreclosure, substantially in the form of the notice set forth in section 5721.181 [5721.18.-1] of the Revised Code, to be published once a week for three consecutive weeks in a newspaper of general circulation in the county. After the third publication, the publisher shall file with the clerk of court an affidavit stating the fact of the publication and including a copy of the notice of foreclosure as published. Within thirty days after the filing of a complaint, the clerk shall also cause a copy of a notice, substantially in the form of the notice set forth in section 5721.181 [5721.18.1] of the Revised Code, to be mailed by ordinary mail with postage prepaid to each person named in the complaint as being the last known owner of a parcel included therein. The notice shall be sent to the address of such person, as set forth in the complaint, and the clerk shall enter the fact of such mailing upon the appearance docket. In the event the name and address of the last known owner of a parcel included in a complaint is not set forth therein, the county auditor shall file an affidavit with the clerk of court stating that the name and address of he last known owner of such parcel does not appear on the general tax list.

ber, 1978, the common pleas court confirmed the sale, ordered a distribution of the proceeds, and decreed that that title to the land shall be incontestable in the purchaser. *See* Ohio Rev.Code § 5721.19.[3]

In December, 1979, defendants Luther and Beatrice Cato executed a promissory note evidencing their joint indebtedness in the amount of $13,800 to defendant Credithrift. As security for payment of the debt the Catos delivered to Credithrift an open-end mortgage, which was duly filed with the Tuscarawas County Recorder. The mortgage encumbers parcel # 1484, the property purchased by Cato at the sale conducted by the sheriff.

## II.

■ The narrow issue presented in the instant case is whether a state foreclosure proceeding to enforce a state tax lien may be utilized to extinguish a choate federal consensual lien that is prior in time. The ultimate resolution of this issue turns upon an analysis of the desirability of adopting as federal law the state law governing both the priority and divestiture of federal consensual liens.

The government argues that the state foreclosure proceeding, purportedly extinguishing the federal lien on parcel # 1484, is invalid because it violated the Supremacy Clause of the federal constitution. *See* U.S. Const. art. VI, cl.2. Relying upon the uniform federal first in time and choateness doctrines for tax liens, it is the government's position that the seniority of the federal lien could not be diminished by the

subsequent accrual of delinquent taxes. In essence the government protests the enforcement of the state tax lien without preserving the federal interest.

■ The government also maintains that the nature of the notice that must be given whenever a state foreclosure action affects a federal lien is governed by federal statute. *See* 28 U.S.C. § 2410(b). The foreclosure action constituted an unconstitutional exercise of state power over a federal interest, the government concludes, because the state procedures[4] deployed did not include the type of notice set forth in the federal statute. Thus, the Court is requested, *inter alia*, to declare the state foreclosure proceeding void.

■ For the reasons stated below, the Court rejects both the government's arguments in support of its prayer to declare the state foreclosure proceeding void. The application of nondiscriminatory state law governing the priority and foreclosure of real estate tax liens may be relied upon to extinguish federal consensual liens. Within the context of this case, the state seniority rule for real estate tax liens was appropriately applied. Also, the notice provision specified in 28 U.S.C. § 2410(b) is discretionary and does not mandate any particular form of notice beyond that which is required under state law.

### A.

Whenever the United States disburses its funds it is exercising a constitutional power. This function is in no way dependent upon the States, as it arises from the constitution

---

3. Section 5721.19 provides in relevant part as follows:

> Unless such land or lots were previously redeemed pursuant to section 5721.25 of the Revised Code, upon the filing of the entry of confirmation of sale, the title to such land or lots shall be incontestable in the purchaser and shall be free and clear of all liens and encumbrances, except such easements and covenants of record running with the land as were created prior to the time the taxes or assessments, for the nonpayment of which the land is sold at foreclosure, became due and payable. The title shall not be invalid because of any irregularity, informality, or

omission of any proceedings under this chapter, or in any processes of taxation, if such irregularity, informality, or omission does not abrogate the provision for notice to holders to title, lien, or mortgage to such foreclosed lands, as prescribed in this chapter.

4. The government does not contend that notice was not effectuated as prescribed by the state statute. Nor does the government challenge the state notice provision as violative of due process. Notwithstanding Ohio's incontestable title rule, failure to give the appropriate notice is grounds for an action to invalidate the title. *See* Ohio Rev.Code § 5721.19.

and statutes of the United States. "In absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards." *Clearfield Trust Co. v. United States*, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943).

Congress has established a number of nationwide federal loan programs. The agencies that administer these programs derive authority to engage in loan transactions from congressional statute. *See e. g.*, 42 U.S.C. §§ 1471 and 1480. Thus the FmHA "unquestionably perform[s] federal functions within the meaning of *Clearfield*" and it is "clear that the priority of liens stemming from federal lending programs must be determined by reference to federal law." *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979) (hereinafter referred to as *Kimbell Foods*.

The FmHA lien at issue here is a product of federal law and its priority status is a federal question. *See* 42 U.S.C. § 1472; 7 C.F.R. § 1822.10 (1980). To resolve the priority conflict between the FmHA consensual lien and the county tax lien, the government urges this Court to apply the uniform federal rules commonly referred to as the first in time and choateness doctrines.[5] While the disposition of the controversy involving the FmHA lien will ultimately turn on federal law, a uniform federal rule is not always warranted nor justified. Whether the federal court should fashion a uniform federal rule for deciding cases involving the operation of a nationwide program touches upon a number of considerations.

The choice between "adopt[ing] state law or . . . fashion[ing] a nationwide federal rule" requires an analysis of several considerations recently articulated by the Supreme Court in *Kimbell Foods*. 440 U.S. at 728, 99 S.Ct. at 1458. The primary and often competing considerations are the need for a uniform rule to effectuate the objec-

tives of the federal program and the intrusion into established state commercial practices and relationships:

> Undoubtedly, federal programs that "by their nature are and must be uniform in character throughout the Nation" necessitate formulation of controlling federal rules. *United States v. Yazell*, 382 U.S. 341, 354, [86 S.Ct. 500, 507, 15 L.Ed.2d 404] (1966); see *Clearfield Trust Co. v. United States supra*, [318 U.S.] at 367 [63 S.Ct. at 575]; *United States v. Standard Oil Co., supra*, [332 U.S. 301] at 311, 67 S.Ct. 1604 at 1609, 91 L.Ed. 2067]; *Illinois v. Milwaukee*, 406 U.S. 91, 105 n.6, 92 S.Ct. 1385, 1393 n.6, 31 L.Ed.2d 712 (1972). Conversely, when there is little need for a nationally uniform body of law, state law may be incorporated as the federal rule of decision. Apart from considerations of uniformity, we must also determine whether application of state law would frustrate specific objectives of the federal programs. If so, we must fashion special rules solicitous of those federal interests. Finally, our choice of law inquiry must consider the extent to which application of a federal rule would disrupt commercial relationships predicated on state law.

440 U.S. at 728–29, 99 S.Ct. at 1458–59. (footnotes omitted).

In *Kimbell Foods* the Supreme Court decided two cases presenting the issue "whether contractual liens arising from certain federal loan programs take precedence over private liens, in the absence of a federal statute setting priorities." 440 U.S. at 718, 99 S.Ct. at 1453. One of the two cases involved a priority conflict between a FmHA contractual security interest in a tractor and a subsequent repairman's lien in the same property. The other case involved a conflict between a private lien and a lien securing a Small Business Administration loan.

In resolving the priority conflict in these two cases the Supreme Court held that "ab-

**5.** The first in time and choatness doctrines were developed primarily to govern competing federal and state tax liens where there is no

federal statutory schedule of priority. *See United States v. City of New Britain*, 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520 (1954).

sent a congressional directive, the relative priority of private liens and consensual liens arising from these Government lending programs is to be determined under nondiscriminatory state laws." 440 U.S. at 740, 99 S.Ct. at 1465. Admittedly, the instant case is not on all fours with the *Kimbell Foods* case. Here the conflict is between a county real estate tax lien and a federal lien securing a FmHA loan. Nonetheless, the rationale of *Kimbell Foods* is instructive and convinces this Court to reach a similar result.[6]

The argument made to the Court by the government that a uniform federal rule is essential both the administration of the FmHA program and its underlying fiscal policies was soundly rejected in *Kimbell Foods.*

■ FmHA regulations attest to both the agency's reliance on state law and its ability to individually tailor loans to meet other circumstances, and evince that there is no need for a uniform federal priority to ease administrative hardship:

FHA regulations expressly incorporate state law. They mandate compliance with state procedures for perfecting and maintaining valid security interests, and highlight those rules that differ from state to state.... Contrary to the Government's claim that the FHA complies only with state procedural rules, the agency's reliance on state law extends to substantive requirements as well. In-

deed, applicable regulations suggest that state rules determine the priority when federal statutes or agency regulations are not controlling.

440 U.S. at 731–32, 99 S.Ct. at 1460–61 (citations and footnotes omitted). The Supreme Court also noted that the FmHA's decentralized practice of utilizing local offices and employees undercut the agency's assertion that its ability to function effectively would be hampered without a uniform body of federal law. *Id.* at 732, 99 S.Ct. at 1461.

The current version of the implementing regulations demonstrates that the FmHA continues to operate its loan program with a view toward state law[7] and through decentralized local offices.[8] Thus the administration of the FmHA loan program is designed to operate efficiently without a uniform federal rule. "Since there is no indication that variant state priority schemes would burden current methods of loan processing, ... considerations of administrative convenience do not warrant adoption of a uniform federal law." 440 U.S. at 733, 99 S.Ct. at 1461.

As in *Kimbell Foods,* here the government asserts that subjecting the FmHA to state law would seriously jeopardize the fiscal integrity of the lending programs by leaving the funds disbursed by the agency inadequately protected. The government

---

**6.** The government suggests that a basis for distinguishing the instant case can be found in *Rust v. Johnson,* 597 F.2d 174 (9th Cir.), *cert. denied,* 444 U.S. 964, 100 S.Ct. 450, 62 L.Ed.2d 376 (1979). That case involved a foreclosure of a street improvement bond by the City of Los Angeles on property which the Federal National Mortgage Association (FNMA) held an assignment of a purchase money mortgage interest. The FNMA is a secondary mortgage facility that has little or no contact with individual mortgagors and does not negotiate the mortgages it takes. It is for these reasons that the *Rust* court held that the Supremacy Clause barred the City from selling the property without protecting the federal interest and distinguished the *Kimbell* case:

Congress has indicated an intent to have state law govern interests held by the SBA and FmHA. Moreover, the SBA and FmHA operate under a set of rules and regulations

which allow them to individually tailor their loans.

FNHA, on the other hand, has little or no contact with its mortgagors and it does not individually negotiate the mortgage contracts it receives.

597 F.2d at 180 (citations omitted). Similarly, the *Rust* case is inapposite for purposes of the instant action.

**7.** Implicit in the current version of the implementing regulations is the agencies' intent to administer the loan program under existing state law. *See e. g.,* C.F.R. §§ 1807.2 and 1872.2 (1980).

**8.** The current version of the implementing regulations erect a detailed network of county, district, and state offices to both administer and manage locally the program. 7 C.F.R. §§ 2003.1 to .5 and §§ 2006.601 to .609 (1980).

therefore prevails upon the Court to impose the federal first in time and choateness doctrines.

The first in time and choateness doctrines were developed in the context of tax liens.[9] The expeditious collection of tax revenues is paramount to the continued existence and vitality of government. The same cannot be said for federal loan programs that are in the nature of government largess and in fact are made possible by an effective tax collection system. The distinction was amply stated in *Kimbell Foods*:

> The importance of securing adequate revenues to discharge national obligations justifies the extraordinary priority accorded federal tax liens through the choateness and first in time doctrines. By contrast, when the United States operates as a moneylending institution under carefully circumscribed programs, its interest in recouping the limited sums advanced is of a different order. Thus, there is less need here than in the tax lien area to invoke protective measures against defaulting debtors in a manner disruptive of existing credit markets.
>
> To equate tax liens with these consensual liens also misperceives the principal congressional concerns underlying the respective statute. The overriding purpose of the tax lien statute obviously is to ensure prompt revenue collection. The same cannot be said of the SBA and FHA lending programs. They are a form of social welfare legislation, primarily designed to assist farmers and businesses that cannot obtain funds from private lenders on reasonable terms. We believe that had Congress intended the private commercial sector, rather than taxpayers in general, to bear the risks of default entailed by these public welfare programs, it would have established a priority scheme displacing state law.

440 U.S. 734–35, 99 S.Ct. at 1461–62 (footnotes omitted).

Far from being in an unprotected position, the government is the master of the transaction and both selects the recipients and establishes the terms of repayment. Under the current version of the implementing regulations, a recipient of a rural housing loan of the type received by the Dansbys must "[h]ave adequate and dependable available income to meet family living expenses, pay taxes, insurance, and maintenance cost, and repayment on debts including the proposed loan." 7 C.F.R. § 1822.4(d) (1980).

Also, the current version of the implementing regulations place upon the local representative of the FmHA the responsibility "for taking all actions in connection with taxes as may be necessary to protect the government's security interests." 7 C.F.R. § 1863.3 (1980). Mortgagees are on notice of Ohio's real estate tax provisions and lend money and take mortgages at their own risk that tax assessments will be paid. *See New York v. Maclay*, 288 U.S. 290, 292, 53 S.Ct. 323, 77 L.Ed. 754 (1933). Once the FmHA avails itself of the particular fashion in which other commercial lenders take notice of delinquent real estate taxes, there are specific measures the FmHA may take to insure payment of the delinquent taxes and protect the government's interest. 7 C.F.R. § 1863.4 (1980).

In *United States v. Cless*, 254 F.2d 590 (3rd Cir. 1958), a private prior mortgage was foreclosed. The government held a secondary mortgage lien that was extinguished upon foreclosure of the prior lien in accordance with state law. Actual notice to junior lienholders was not required. In *Cless* the government's argument that it should receive preferential treatment in the form of actual notice was rejected for reasons that are equally persuasive here:

> In the absence of express congressional action to the contrary, we think it is not asking too much from a federal agency, which has embarked upon the business of lending money in competition with private firms and individuals, simply to be governed by the same local law which controls the rights of private citizens in a similar endeavor. And the government

9. See note 5 *supra*.

could not have been taken by surprise by local law established for one hundred years and more. In this situation, notice adequate to others is adequate to the United States.

254 F.2d at 594.

Credithrift and the Catos have arranged financial transactions with an evaluation of risks and reliance upon the Ohio rule that incontestable title is reposed in the purchaser of land subject to foreclosure proceedings on a real estate tax lien. To impose a uniform federal rule would substantially threaten such private commercial relationships. "Because the ultimate consequences of altering settled business practices are so difficult to foresee," this Court declines to "create new uncertainties in the absence of careful legislative deliberation." *Kimbell Foods*, 440 U.S. at 740, 99 S.Ct. at 1465.

Noting that the Uniform Commercial Code already standardizes commercial practices, the government proposes that implicit in the *Kimbell Foods* decision is the recognition that a nationwide rule would be superfluous. Because practices for enforcing the collection of delinquent real estate taxes varies from State to State, the government argues that it would be consistent with the Supreme Court's rationale in *Kimbell Foods* to impose a uniform federal rule. This argument ignores the important concern of avoiding intrusive and unforeseeable consequences a nationwide rule, without which the objectives of the federal loan program may reasonably be obtained, would have upon state commercial practices and relationships and exposes its fallacy.

Similarly, formulation of a uniform federal rule for the convenience of a national loan program cannot be justified when measured against the cost of intruding into the State's tax collecting function.[10] Although such a rule would perhaps be more administratively convenient, its potential disruptive effect on a vital state function counsels against its imposition. Concomitantly, the reasons for the priority afforded federal tax liens are no less compelling when the state taxing power is at issue.

There is simply no sound basis for altering Ohio's seniority and incontestable title rules for real estate tax liens. A uniform federal rule is not necessary to reasonably achieve the obligations of the FmHA loan program, and it is certainly not justified when compared to the intrusive effect it would have upon both private commercial transactions and the state tax collecting function.

### B.

Under the doctrine of sovereign immunity, the United States cannot be sued without its consent.[11] A judicial proceeding against property in which a federal agency has an interest is a suit against the United States and cannot be maintained without its consent. *See e. g. United States v. Alabama*, 313 U.S. 274, 282, 61 S.Ct. 1011, 1014, 85 L.Ed. 1327 (1941). Implicit in the power to lift the bar of sovereign immunity is also the authority of Congress to prescribe conditions under which the suit may proceed.

Sovereign immunity precludes a senior lienholder from obtaining a judicial decree extinguishing a junior federal interest. Thus Congress lowered the shield of sovereign immunity for actions affecting proper-

---

**10.** The *Kimbell Foods* case was primarily concerned with the disruptive effect that a uniform federal rule would have upon private commercial relations. The collection of state taxes must take priority over private commercial transactions and this priority is codified in Ohio's statutes providing for foreclosure on real estate tax liens. The reluctance to impose a uniform federal rule for the priority of FmHA liens, therefore, applies with equal force when the consequences would disrupt the State's tax collecting function.

**11.** The precise origin and appropriate scope of sovereign immunity as it relates to the United States are issues that defy conclusive resolution. *See* P. Bantor, P. Mishkin, D. Shapiro, & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System, 1339–51 (2d ed. 1973) (hereinafter referred to as Hart & Wechsler).

ty on which the federal government holds a lien by enacting 28 U.S.C. § 2410:[12]

(a) Under the conditions prescribed in this section and section 1444 of this title for the protection of the United States, the United States may be named a party in any civil action or suit in any district court, or in any State court having jurisdiction of the subject matter—

(1) to quiet title to,

(2) to foreclose a mortgage or other lien upon,

(3) to partition,

(4) to condemn, or

(5) of interpleader or in the nature of interpleader with respect to,

real or personal property on which the United States has or claims a mortgage or other lien.

Also set forth in this congressional enactment are numerous provisions dealing with actions that are brought by virtue of this consent to be sued:

(b) The complaint or pleading shall set forth with particularity the nature of the interest or lien of the United States. In actions or suits involving liens arising under the internal revenue laws, the complaint or pleading shall include the name and address of the taxpayer whose liability created the lien and, if a notice of the tax lien was filed, the identity of the internal revenue office which filed the notice, and the date and place such notice of lien was filed. *In actions in the State courts service upon the United States shall be made by serving the process of the court with a copy of the complaint upon the United States attorney for the district in which the action is brought or*

*upon an assistant United States attorney or clerical employee designated by the United States attorney in writing filed with the clerk of the court in which the action is brought and by sending copies of the process and complaint, by registered mail, or by certified mail to the Attorney General of the United States at Washington, District of Columbia.* In such actions the United States may appear and answer, plead or demur within sixty days after such service or such further time as the court may allow.

28 U.S.C. § 2410(b) (emphasis added).

It is the government's contention that 28 U.S.C. § 2410(b) proscribes the mandatory conditions for commencing a suit to foreclose a lien on property in which there is also a federal interest. Certainly Congress has the power to specify the conditions under which a suit may proceed against the government. This particular waiver of sovereign immunity for actions affecting property on which the government has a lien, however, has been interpreted as merely a consent to be sued in cases that had previously worked an injustice upon private lienors; 28 U.S.C. § 2410 on its face evidences "no intent to exclude otherwise available state procedures." *United States v. Brosnan*, 363 U.S. 237, 246, 80 S.Ct. 1108, 1113, 4 L.Ed.2d 1192 (1960) (hereinafter referred to as *Brosnan*).[13]

In examining the statute the *Brosnan* Court discussed several features that supported its decision.

First, the Court noted the permissive tenor of the statute: "[T]he United States may be named a party in any civil action...." 28 U.S.C. § 2410(a). *See* 363 U.S. at 246, 80 S.Ct. at 1113.

**12.** Part of the impetus to promulgating 28 U.S.C. § 2410 was a "response to the recognized need for a way to force disputes over government tax liens to a resolution." *United States v. Perry*, 473 F.2d 643, 645 (5th Cir. 1973). This provision is often relied upon by taxpayers to challenge the enforcement of a federal tax lien by bringing an action to quiet title. *See* Annot., 38 A.L.R.Fed. 900 (1978).

**13.** The *Brosnan* case involved private senior lienors who extinguished federal tax liens. The instant case involves state tax liens, but this distinction is not material. There is no apparent basis for affording any less access to the judicial process, either under 28 U.S.C. § 2410 or the holding in *Brosnan*, when the action involves state tax liens on property upon which there is also a federal consensual lien.

Second, the statute [14] provides that "a judicial sale is to have the same effect as it would have under local law, but nothing in the section indicates when a judicial sale is to be had." 363 U.S. at 246, 80 S.Ct. at 1113 (addressing 28 U.S.C. § 2410(c)).

Finally, the Court turned to the specific permission of 28 U.S.C. § 2410(a) to bring an action to quiet title. If a federal lien was extinguished pursuant to 28 U.S.C. § 2410, there would be no need to bring a subsequent suit to quiet title. "Therefore, Congress must have recognized the possibility that state procedures might affect federal liens." 363 U.S. at 247, 80 S.Ct. at 1114.

▇ In light of these features of 28 U.S.C. § 2410 and the absence of any congressional intent to the contrary, the *Brosnan* Court interpreted the statute as merely a consent to be sued and not a statement of the mandatory procedures to be followed in commencing such suits. By consenting to be sued, therefore, the United States has required neither that it be named a party in all suits allowable under 28 U.S.C. § 2410(a) nor that service be effectuated in the manner described in 28 U.S.C. § 2410(b):

> [T]he basic question is not what the existing state of the law was, or even what Congress believed it to be, but whether Congress intended to exclude the application of all state procedures, whatever

their existence of effectiveness might be. No such inference can be drawn.... 363 U.S. at 250, 80 S.Ct. at 1116.

The holding in *Brosnan* is inimical to the government's argument that the state foreclosure proceeding at issue in the instant case is voidable because there was no compliance with the service provision in 28 U.S.C. § 2410(b). At most the service provision directs the appropriate fashion to effectuate service upon the United States when it is named as a party in a suit allowable under 28 U.S.C. § 2410. The statute waives sovereign immunity for the class of suits that affect federal liens on property while recognizing that the United States will not always be named a party to the proceedings.

▇ *Stare decisis* is not axiomatic and judicial interpretation of a statute is open to change even where Congress has not amended the statute. *See Indian Towing Co. v. United States*, 350 U.S. 61, 74, 76 S.Ct. 122, 129, 100 L.Ed. 48 (1955) (Reed, J., dissenting). This Court is aware of no decision since the *Brosnan* case that would indicate any judicial retrenchment from its interpretation of 28 U.S.C. § 2410. Furthermore, Congress has amended 28 U.S.C. § 2410 without disturbing the features upon which the *Brosnan* Court relied. No other legislative action has been taken by Congress that voices any disagreement with the

14. This subsection of 28 U.S.C. § 2410 reads as follows:

(c) A judgment or decree in such action or suit shall have the same effect respecting discharge of the property from the mortgage or other lien held by the United States as may be provided with respect to such matters by the local law of the place where the court is situated. However, an action to foreclose a mortgage or other lien, naming the United States as a party under this section, must seek judicial sale. A sale to satisfy a lien inferior to one of the United States shall be made subject to and without disturbing the lien of the United States, unless the United States consents that the property may be sold free of its lien and the proceeds divided as the parties may be entitled. Where a sale of real estate is made to satisfy a lien prior to that of the United States, the United States shall have one year from the date of sale within which to redeem, except that with

respect to a lien arising under the internal revenue laws the period shall be 120 days or the period allowable for redemption under State law, whichever is longer, and in any case in which, under the provisions of section 505 of the Housing Act of 1950, as amended (12 U.S.C. 1701k), and subsection (d) of section 1820 of title 38 of the United States Code, the right to redeem does not arise, there shall be no right of redemption. In any case where the debt owing the United States is due, the United States may ask, by way of affirmative relief, for the foreclosure of its own lien and where property is sold to satisfy a first lien held by the United States, the United States may bid at the sale such sum, not exceeding the amount of its claim with expenses of sale, as may be directed by the head (or his delegate) of the department or agency of the United States which has charge of the administration of the laws in respect to which the claim of the United States arises.

interpretation rendered in *Brosnan.* When the general principle of *stare decisis* is combined with congressional inaction following an important decision of the Supreme Court, the synergistic effect is a compelling "aid in statutory construction ... useful at times in resolving statutory ambiguities." *Helvering v. Reynolds,* 313 U.S. 428, 432, 61 S.Ct. 971, 973, 85 L.Ed. 1438 (1941).

Holding that the *Brosnan* interpretation of 28 U.S.C. § 2410 is equally applicable to the factual context of the instant case does not conclude the analysis. There remains the issue whether a uniform federal rule should be judicially imposed upon the state courts in cases affecting federal liens.[15]

Broadly stated, the principles of federalism upon which our dual system of courts operate advise that federal issues raised in state courts should be resolved within the procedures normally relied upon by those courts.[16] The convenience of the uniform personal service that the government asserts was required to validly extinguish the federal interest is apparent. Yet, congressional intent that the litigant pursuing a claim against property on which there is a federal lien have access to the state judicial forum is implicit in the language of 28 U.S.C. § 2410.

Both the tenants of federalism and the approach of Congress support protecting the integrity of the well-established state procedures and avoiding the quandry of competing property interests a judicially imposed federal rule would undoubtedly beget. These concerns, as initially expressed in the *Brosnan* decisions, are no less relevant and insightful today:

> It must be recognized that the factors supporting a federal fule of uniformity in this field, and those militating against the dislocation of long-standing state procedures, are full of competing consideration. They involve many imponderables which this Court is ill-equipped to assess, on which Congress has not yet spoken,

and which we think are best left to that body to deal with in light of their full illumination. A wise solution of such a far-reaching problem cannot be achieved within the confines of a lawsuit. Until Congress otherwise determines, we think that state law is effective to divest government junior liens in cases such as these.

363 U.S. at 251–52, 80 S.Ct. at 1116–17.

The government attempts to distinguish the *Brosnan* case from the foreclosure at issue in the instant case by describing the federal lien here as a senior lien. The holding of *Brosnan* should not be followed in this case, argues the government, because there the Supreme Court was faced with junior federal tax liens. Suffice it to note that this Court has stated above its reasons for holding that the county real estate lien is senior to the federal consensual lien by operation of state law.

Whatever meaningful distinction that can be made between the federal tax lien and the federal consensual lien only works against the merits of the government's case. Ranking these federal liens in order of importance, it is the federal tax lien that is deserving of greater attention. It is an important part of the tax collecting function and, unlike its status as a consensual lienor, the government is an involuntary debtor of the delinquent taxpayer. *See Kimbell Foods, supra* 440 U.S. at 736, 99 S.Ct. at 1462. The *Brosnan* decision subjects federal tax liens to divestiture under state law. The federal consensual lien certainly does not warrant receiving any more protection than the federal tax lien or justify altering the traditional, nondiscriminatory state procedures for enforcing real estate tax liens.

### III.

The government also brings a claim against defendants Osie and Lillian Dansby for defaulting on the loan provided by the

---

15. A detailed analysis of the displacement of state procedural rules by federal rules in cases involving federal questions appears in Hart & Wechsler, *supra* note 11 at 567–73.

16. *See* Hart, *The Relations Between State and Federal Law,* 54 Colum.L.Rev. 489, 508 (1954).

FmHA. A statement of account prepared by the FmHA indicates that the Dansbys owe a principal sum of $16,172.37, plus interest accrued through March 17, 1980, in the amount of $1,187.84. The daily interest accrual is $1.82. Said defendants have not answered the complaint or otherwise appeared in the instant proceeding. Therefore, judgment shall be granted in favor of the FmHA and against the Dansbys in the amount of $17,997.21.

### IV.

Accordingly, based upon the foregoing, the Court hereby enters judgment in favor of the government in the amount of $17,-997.21 on its claim against the Dansbys; enters judgment in favor of the defendants on all the government's remaining claims; and enters judgment in favor of Credithrift on its counterclaim for declaratory relief.

IT IS SO ORDERED.