James A. and Catherine
L. BRIGHTWELL,
Plaintiffs,

v.

UNITED STATES of America,
Defendant.

No. IP 89–59–C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Nov. 10, 1992.

---

A. Donald Wiles, Jeffrey W. Scripture, Harrison & Moberly, Indianapolis, Ind., for plaintiffs.

Sue Hendricks Bailey, Asst. U.S. Atty., Office of the U.S. Atty., Indianapolis, Ind., Charles M. Greene, Peter Sklarew, Trial Attys., Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

McKINNEY, District Judge.

This case addresses two issues: (1) whether a federal tax lien is valid, when the notice of lien lists an incorrect middle initial for the taxpayer, and inserts an extra space in his last name; and (2) whether the senior lien of a mortgagee, who forecloses and buys the property at a foreclosure sale, can be asserted by the mortgagee's transferee against a junior lienholder who was not a party to the foreclosure action.

### I. FACTS AND PROCEDURAL BACKGROUND

The key facts are undisputed. William B. VanHorn purchased three parcels of real property from the Indianapolis Spring Corporation ("ISC") on November 10, 1982, executing a purchase money mortgage in ISC's favor.[1] On May 24, 1984, VanHorn was assessed for $10,247.53 in unpaid federal tax liabilities. On July 13, 1984 the Internal Revenue Service ("IRS") executed a lien against VanHorn for this amount (the "first lien"), and filed a Notice of Federal Tax Lien (the "first notice") in the Marion County, Indiana Recorder's Office.

Every tax lien notice filed in the recorder's office before 1987 was indexed according to a standardized procedure: office staffers would transcribe information from the notice onto a card, which then was placed in the county's federal tax lien index.[2] These cards contained only basic information—the taxpayer's name, a reference number, and the filing date—and were filed alphabetically according to the last name of the taxpayer. The first notice was indexed no differently, but unbeknownst to the IRS, it contained a mistake: it listed the taxpayer's name as "William S̲. Van̲

---

1. Each document discussed in this order is attached as an exhibit to the Amended Complaint or some other pleading in the record.

2. Since 1987, notices have been indexed on computer.

Horn," rather than "William B. Van-Horn."[3] When it was transcribed onto the index card, this error found its way into the lien index.

The IRS executed a second tax lien against VanHorn and his wife for $875.82 in late 1984 (the "second lien"), and filed a corresponding notice on December 11, 1984 (the "second notice"). The second notice correctly identified the taxpayer(s) as "William B. VanHorn & Carlotta VanHorn." As a result, it was correctly indexed, and its index card was filed immediately in front of the card for the first lien. Both cards are still in the index, right next to one another.

By June 1986, VanHorn defaulted on his mortgage payments, so ISC brought an action to foreclose. ISC hired the Lawyer's Title Insurance Company to research the status of VanHorn's title, but the company failed to discover either of the two tax liens against the property, even though the second notice was correct and properly indexed. Therefore, the IRS never learned of, and did not become a party to, ISC's foreclosure action. ISC eventually achieved a consent judgment foreclosing the interests of VanHorn, a second mortgagee, and a judgment creditor in the property. ISC then purchased the property at a sheriff's sale on September 18, 1986.

Sometime afterward ISC, in preparing the property for sale to a third party, hired the Chicago Title Insurance Company to research title and provide insurance. This time a search revealed the second notice, but the first notice remained undiscovered. ISC's attorney checked with the IRS about satisfying the second lien, and was told that it would be released upon payment of the total deficiency ($875.82) and interest. ISC paid this amount, and the IRS released the lien—never mentioning that a prior, larger tax lien still encumbered the property.

On July 1, 1987, ISC sold the property by warranty deed to plaintiffs James and Catherine Brightwell, representing that no tax liens encumbered its title. As a result, the plaintiffs believed that the property was theirs free and clear. Before long, however, they learned about the first lien, the first notice, and the mistake the IRS had made in naming VanHorn as the taxpayer.

So, the plaintiffs decided to sue. On December 27, 1988, they filed a strict foreclosure petition in Marion County Superior Court, seeking to cut off the government's lien on the property. The government removed the case to federal court on January 20, 1989, where it was assigned to Judge John Daniel Tinder. On April 24, 1989, the plaintiffs amended their complaint to add a claim to quiet title. The government thereafter filed a motion for summary judgment,[4] which became ripe for ruling on August 22, 1989. The plaintiffs moved for summary judgment on August 7, 1989, and this motion became ripe on September 18, 1989. In November 1991, the case was transferred from Judge Tinder to the docket of this Court, which ordered the parties to file superseding briefs on their motions. This briefing was finished on March 20, 1992.

The plaintiffs assert that the first lien is invalid, because they never received constructive notice of its existence.[5] Their claim hinges on one contention: that the difference between the name "William S. Van Horn," which was on the first lien's index card, and "William B. VanHorn," which is the correct taxpayer name, is so great that no reasonable search of the in-

3. An authenticated photocopy of the actual index entry is attached as Exhibit B to Plaintiffs' Memorandum In Opposition to Defendant's Motion to Dismiss and in Support of Motion for Summary Judgment (Aug. 7, 1989). Apparently, there is no taxpayer or property owner named "William S. Van Horn" against whom a federal tax lien has been recorded.

4. The government's motion actually sought dismissal. However, because the motion was supported by declarations and other extra-pleading materials, the Court will treat it as one for summary judgment. *See Sheldon v. Munford, Inc.,* 660 F.Supp. 130, 136 (N.D.Ind.1987); *Mac's Eggs, Inc. v. Rite–Way Agri Distribs., Inc.,* 656 F.Supp. 720, 727–28 (N.D.Ind.1986).

5. No one disputes that the plaintiffs lacked actual notice of the first lien.

dex for liens against "Williams B. VanHorn" would have led to the first lien's discovery. The IRS disagrees, claiming that the two names are substantially identical, and that a reasonable searcher, noticing this similarity, would have looked at the actual lien notices and discovered the existence of the first lien. Alternatively, the plaintiffs contend that even if the first lien is valid, their interest nevertheless has priority, because they are equitable assignees of ISC's mortgage lien against the property.

## II. LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A party moving for summary judgment initially has the burden of showing the absence of any genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Covalt v. Carey Canada, Inc.*, 950 F.2d 481, 482 (7th Cir.1991). If the moving party carries this burden, the opposing party then must "go beyond the pleadings" and present specific facts which show that a genuine issue exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Co.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Becker v. Tenenbaum–Hill Assocs.*, 914 F.2d 107, 110 (7th Cir.1990). The opposing party, however, must do more than create a mere "colorable" factual dispute to defeat summary judgment; disputed facts must be outcome determinative. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *International Bhd. of Boilermakers v. Local D354*, 897 F.2d 1400, 1406 (7th Cir.1990); *Clampitt v. Ft. Wayne*, 682 F.Supp. 401 (N.D.Ind.), *aff'd*, 864 F.2d 486 (7th Cir. 1988).

In considering a summary judgment motion, a court must draw all reasonable inferences "in the light most favorable" to the opposing party, *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991), and must resolve any doubt against the moving party. *Becker*, 914 F.2d at 110. Still, if the opposing party fails to meet the standards of Rule 56(c), summary judgment becomes mandatory. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Anderson*, 477 U.S. at 248–50, 106 S.Ct. at 2510–11. Summary judgment is not a disfavored procedural shortcut; rather, it is an integral part of the federal rules, which are designed to secure the just and expeditious determination of every action. *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555; *see Patrick v. Jasper County*, 901 F.2d 561, 565 (7th Cir.1990); *Spellman v. Commissioner*, 845 F.2d 148, 151–52 (7th Cir.1988).

## III. DISCUSSION

### A. *Jurisdiction*

Initially, the Court must determine if it has jurisdiction over the plaintiffs' suit. The United States cannot be sued, and no court can have jurisdiction over a suit against it, unless its sovereign immunity has been waived in the area at issue. *Raulerson v. United States*, 786 F.2d 1090, 1091 (11th Cir.1986). In cases that involve tax liens against property, sovereign immunity has been waived, at least in part:

[T]he United States may be named a party in any civil action or suit in any district court, or in any State court having jurisdiction of the subject matter—
  (1) to quiet title to,
  (2) to foreclose a mortgage or other lien upon,
  (3) to partition,
  (4) to condemn, or
  (5) of interpleader or in the nature of interpleader with respect to,
real or personal property on which the United States has or claims a mortgage or other lien.

28 U.S.C. § 2410(a).

To the extent that the plaintiffs seek to quiet title, this Court clearly has jurisdic-

tion. Traditionally, actions to quiet title have sought determinations of who owns particular property, by forcing adverse claimants—i.e., those whose claims are "clouds" on the plaintiff's title—to establish them or be estopped from asserting them ever again. *Black's Law Dictionary* 255, 1249 (6th ed. 1990); *see Raulerson v. United States*, 786 F.2d 1090, 1092 (11th Cir.1986). Under federal law, the definition is somewhat broader; a party may maintain a quiet title action against the United States when the government asserts that a federal tax lien exists against property, 28 U.S.C. § 2410(a), and thus lien priority disputes have been considered "quiet title" actions. *McEndree v. Wilson*, 774 F.Supp. 1292, 1295–96 (D.Colo.1991). Under this standard, the plaintiffs' amended complaint states a valid action to quiet title against the United States.

■ The strict foreclosure component of the plaintiffs' complaint poses a thornier problem. If a suit involves foreclosure of a mortgage, a waiver of sovereign immunity will be effective only to the extent that the plaintiff seeks a "judicial sale" of the property—i.e., a sale directed by judicial order, decree, or judgment. *Id.* § 2410(c); *Kasdon v. G.W. Zierden Landscaping, Inc.*, 541 F.Supp. 991, 996 (D.Md.1982), *aff'd*, 707 F.2d 820 (4th Cir.1983). The plaintiffs seek a judicial sale of the property,[6] but the government claims that such sales are not recognized remedies for strict foreclosure actions in Indiana.

■ The government's assertion is correct, at least on one level. Strict foreclosure permits a party who acquired title through or after a foreclosure sale to cut off the interests of any junior lienholders who, for some reason, were not parties to the foreclosure action. Strict foreclosure, therefore, is quite different from judicial foreclosure, where a mortgagee sells the property to satisfy an underlying secured debt. *See Jackson v. Weaver*, 138 Ind. 539, 38 N.E. 166 (1894) (strict foreclosure case);

*Jefferson v. Coleman*, 110 Ind. 515, 11 N.E. 465 (1887) (same).

■ However, the fact that Indiana has never ordered a judicial sale in a strict foreclosure action does not mean that such a remedy is barred. The United States Supreme Court, in fact, has upheld an order for judicial sale in a strict foreclosure action, finding it appropriate under the plaintiff's prayer for general relief. *Sage v. Central R.R. Co.*, 99 U.S. 334, 338–44, 25 L.Ed. 394 (1878). Courts in other states also have been friendly to the idea. *See, e.g., Williams v. Williams*, 32 Ariz. 164, 256 P. 356, 357–58 (1927) (vacating foreclosure and ordering new sale); *Johns v. Wilson*, 6 Ariz. 125, 53 P. 583, 585 (1898) (allowing second foreclosure sale to cut off interest of lienholder not joined originally), *aff'd*, 180 U.S. 440, 21 S.Ct. 445, 45 L.Ed. 613 (1901); *Deming Nat'l Bank v. Walraven*, 133 Ariz. 378, 651 P.2d 1203, 1205–06 (App.1982) (allowing foreclosure sale to follow initial execution action where lienholder was not joined); *McGraw v. Premium Fin. Co. of Missouri*, 7 Kan.App.2d 32, 637 P.2d 472, 477 (1981) (recognizing that second foreclosure might be necessary where junior lienholder was not joined initially); *Western Bank v. Fluid Assets Dev. Corp.*, 111 N.M. 458, 806 P.2d 1048 (1991) (recognizing that in "proper case," new sale might follow first where junior lienholders were not joined); *Moulton v. Cornish*, 138 N.Y. 133, 33 N.E. 842 (1893) (finding that redemption cannot be compelled in strict foreclosure, but that new sale can be ordered).

The exact facts of these cases vary, but they still support the idea that judicial sale is a proper remedy in actions that begin or are labelled as strict foreclosures. Accordingly, the Court holds that it has jurisdiction over both the plaintiffs' claims under 28 U.S.C. § 2410.

### B. *Validity of the First Lien*

Federal tax liens are "wholly ... creature[s] of federal law," *Atlantic States*

---

6. The plaintiffs expressed their desire to seek judicial sale in a conference with the Court earlier in this case, and the government agreed to address the claim without formal amendment of the complaint. The Court since has proceeded on the assumption that a judicial sale is sought.

*Const., Inc. v. Hand, Arendall, Bedsole, Greaves & Johnston,* 892 F.2d 1530, 1534 (11th Cir.1990),[7] and federal law governs all their aspects, including scope, attachment, and priority. 26 U.S.C. § 6323(f); *Kivel v. United States,* 878 F.2d 301, 303 (9th Cir. 1989); *United States v. Polk,* 822 F.2d 871, 873 (9th Cir.1987); *Eskanos v. Alpha 76, Inc.,* 712 F.Supp. 819 (D.Colo.1989).

■ According to 26 U.S.C. § 6323(a), a tax lien is not valid against any purchaser, secured party, statutory lienor, or judgment creditor that lacks actual notice of the lien until "constructive" notice—i.e., notice which meets the requirements of 26 U.S.C. § 6323(f)—has been filed by the IRS. Section 6323(f) requires constructive notice to meet certain form and content requirements,[8] and in the case of real property, mandates filing in one office within the county in which the property is situated, as designated by the laws of the state. If state law provides that deeds must be recorded and indexed to be valid, and "there is maintained ... an adequate system for public indexing of Federal tax liens," then

> the notice of the lien ... shall not be treated as meeting the filing requirements ... unless the fact of filing is entered and recorded in the index ... in such a manner that a reasonable inspection of the index will reveal the existence of the lien.

26 U.S.C. § 6323(f). In other words, if a state indexes federal tax lien notices, and determines priorities based on its indexing system, the IRS must use the system to give constructive notice of its lien. Indiana uses such an indexing system.

The parties agree that the first notice was filed in the correct place and on the correct form. They disagree, however, about whether it was filed in such a man-

ner that a "reasonable inspection of the index" would have "reveal[ed] the existence of the [first] lien," so as to charge the plaintiffs with constructive notice of the lien. This issue embraces two distinct questions. First, what constitutes a "reasonable inspection of the index"? Second, if a reasonable inspection had been made in this case, would it have failed to reveal the first lien due to errors in VanHorn's name as transcribed in the first notice and its index card?

■ As to the first question, the available case law makes clear that a searcher, upon seeing information in the index that would cause a reasonable person to go outside the index and examine the lien notices themselves, *must* look at those notices. As the Ninth Circuit has stated:

> [W]e must decide whether a "reasonable inspection of the index" means that a searcher need only look at the index and has no obligation to go from the index to the actual conveyances that are indexed. Such a literal construction [of § 6323] would not make sense. It is evident that as to documents that are in the actual chain of title the searcher must at least look at such documents as may have a current effect and must then act on the notice imparted.

*Kivel,* 878 F.2d at 304; *see also Richter's Loan Co. v. United States,* 235 F.2d 753, 755 (5th Cir.1956).

This leads to the second question. Would a reasonable inspection of the index (or in this case, the first lien's index card) have failed to give a reasonable searcher any cause to look at the lien notices themselves? Stated differently, would a searcher have been so misled by the errors in VanHorn's name as to think the liens involved completely different taxpayers? The answer, according to the weight of

---

7. Tax liens are powerful; once created, they reach "all property and rights to property, whether real or personal, belonging to [the taxpayer]," 26 U.S.C. § 6321, and may be enforced from the moment attachment occurs at assessment. 26 U.S.C. § 6322. Moreover, tax liens can attach to particular items of property, encumbering title even after the items are transferred to a third party, provided that statutory

notice requirements are met. 26 U.S.C. § 6323(a), (f).

8. IRS regulations promulgated pursuant to 26 U.S.C. § 2363(f) require the IRS to use Form 668, "Notice of Federal Tax Lien Under Internal Revenue Laws," to file a lien notice in a state indexing system. Treas.Reg. § 301.6323–1(3).

well-reasoned authority, appears to be "no."

▮ Initially, it is clear that lien notices and index cards need to comply only substantially, rather than perfectly, to convey adequate notice of a lien:

The mere fact that a full name is not given or that there is an addition, omission or substitution of letters in a name, or even errors, does not, in and of itself, invalidate the notice. The essential purpose of the filing of the lien is to give constructive notice of its existence. The test is not absolute perfection in compliance with the statutory requirement for filing the tax lien, but whether there is substantial compliance sufficient to give constructive notice and to alert one of the government's claim.

*United States v. Sirico*, 247 F.Supp. 421, 422 (S.D.N.Y.1965). Numerous courts have applied this standard, and each decision indicates that the first notice here was statutorily adequate. In *Sirico*, for example, the court gave effect to a lien when the notice listed "Sirico, George" and "Sirico, A." as taxpayers, but title documents listed "Assunta Sirico" as the property's owner. *Id.* at 422. In *Richter's Loan*, the notice and index entry transposed two letters in the taxpayers' name, listing it as "Freidlander" rather than "Friedlander." The court enforced the lien, however, holding that "the slight difference in spelling the name 'Freidlander' instead of 'Friedlander' could not mislead searchers of record, who were contemplating doing business with [the taxpayers]." *Richter's Loan*, 235 F.2d at 755. In *Hannus v. United States*, 60–2 U.S. Tax Cas. (CCH) ¶ 9574 (W.D.Wash.1958), a tax lien against "Andy Johnston" was held valid against property titled in the name of "Andrew Johnston." *See also Kivel*, 878 F.2d at 304 (giving lien notices naming "Bobbie Morgan" effect against property owned by "Bobbie Morgan Lane"); *Polk*, 822 F.2d at 873–74 (enforcing lien notices

naming "Roy Bruce Polk" against property held by "Bruce Polk").

The errors in these cases did not greatly affect the location of index entries, but courts have forgiven mistakes of a much greater magnitude under the substantial compliance standard. For example, in *Weeks v. United States*, 87–1 U.S. Tax Cas. (CCH) ¶ 9246 (D.Md.1987), a lien notice against "Kenneth Gardner Contracting, Inc." was held effective against property deeded to "K.P. Gardner Contracting, Inc.," even though the mistake caused the notice to be indexed over 100 pages from where it should have been. The court held that a reasonable inspection of the index required examination of older, differently arranged index volumes that would have put a searcher on notice of a link between the named entities. *Id.* at ¶ 87,469.

▮ The plaintiffs respond to this by arguing that the substantial compliance standard, at least as it was applied in *Sirico*, *Richter's Loan*, *Weeks*, and *Hannus*, does not govern this case because the facts are drastically different. According to the plaintiffs, those cases dealt with index entries that listed not only taxpayer names, but correct taxpayer and/or property addresses; as a result, an index searcher could have found other entries and liens against the taxpayers at issue by cross-referencing the additional information.[9] Marion County, in contrast, uses a "name-only" index—i.e., its cards provide taxpayer names only, without addresses or any other information. Under such circumstances, the plaintiffs contend, searchers are forced to rely strictly on the taxpayer names as listed, and the law "demands a strict standard for correct spelling of the name[s]."

This argument, though not unappealing, has two major problems. First, the cases relied upon by the plaintiffs—*Continental Investments v. United States*, 142 F.Supp. 542 (W.D.Tenn.1953); *United States v. Ruby Luggage Corp.*, 142 F.Supp. 701 (S.D.N.Y.1954); *Haye v. United States*, 461

---

9. Presumably, the presence of an address allows a researcher to find a lien notice through recognition of the street address on the incorrect index entry, or through discovery that the incorrect entry's address matches the address on a technically correct card (which assumes more than one outstanding lien against the taxpayer).

F.Supp. 1168 (C.D.Cal.1978); and *Fritsch-ler, Pellino, Schrank & Rosen, S.C. v. United States,* 716 F.Supp. 1157 (E.D.Wis. 1988)—are distinguishable from this case, and do not support their argument. In *Continental,* the IRS filed a lien notice against one "W.*B.* Clark, Sr." when the taxpayer's correct name was "W.*R.* Clark, Sr.," and thereafter seized and sold the taxpayer's car. The plaintiff, a mortgagee of the car, sued for conversion and won. The court, without citation to any authority, held that the mortgagee was "not charged with notice of anything beyond" what the lien records "purport[ed] to be on their face." *Continental,* 142 F.Supp. at 544. In *Continental,* however, the taxpayer's initials were used in place of both his first and middle "Christian name[s]," which prompted the court to require perfectly correct initials. *Id.* Here, VanHorn's first name was correctly listed on both index cards, so any potential for confusion was much smaller than in *Continental.* In addition, *Continental* was decided in 1953, well before Congress enacted § 6323 with its "reasonable inspection" standard, and the court appears to have applied a higher standard of exactness than the current law requires.

In *Ruby Luggage,* the government filed notice against "Ruby Luggage Corporation" instead of "*S.* Ruby Luggage Corporation." The court examined whether the missing "*S.*" materially affected priority under New York's indexing system, and held that it did. The circumstances of that case, however, made the error much more critical than the one here. New York law required judgment dockets to have separate volumes for each letter of the alphabet, and provided that liens against corporations be filed in the volume corresponding to the first letter of the corporate name. The notice against "Ruby Luggage Corporation" was indexed in the "R" volume; consequently, no search of the "S" volume—where the notice should have been indexed—would have revealed the lien's existence. *Ruby Luggage,* 142 F.Supp. at 702. The error here, like the one in *Ruby Luggage,* did concern an initial; however, it affected arguably the least important part

of the taxpayer's name, and resulted in no serious indexing error. In fact, the index cards were (and are) right next to one another.

*Haye,* too, involved more significant errors than the one at issue here. There, the notice referred to the taxpayer as "Manua l de J. Caste llo," when his correct name was "Manue l J. de Casti llo." The court held that a reasonable search of the index would not have disclosed the lien, because these two errors, coupled with the relative commonness of the taxpayer's last name, caused the notice to be indexed "approximately nine pages and one thousand names prior to its proper location"—a scope well beyond the "reasonable inspection" required by statute. *Haye,* 461 F.Supp. at 1173–74. By contrast, the mistake in Van-Horn's name left the index card for the first notice exactly where it would have been, even if perfect: right next to the card for the second notice.

*Fritschler* is the plaintiffs' strongest case. There, the court held that a lien notice filed in Florida under the name "Allen *G.* Casey" failed to give constructive notice of a lien against "Allen *J.* Casey," because it "was not in compliance with the statute." *Fritschler,* 716 F.Supp. at 1160. The court appeared to recognize the governance of the "reasonable inspection" standard, but held that the government had "failed to support its assertion that a reasonably prudent person conducting a tax lien search ... would have realized that Alan G. Casey was really Alan J. Casey." *Id.* at 1161–62 (citing *Haye, Continental,* and *Richter's Loan* ).

Despite its apparent helpfulness to the plaintiffs, however, *Fritschler* ultimately falls short. It appears that the decision there did not hinge on the issue of constructive notice, because the property subjected to the tax lien—cash—is treated differently under the lien statute, as the court pointed out:

> Even if the filing of a notice of tax lien which misspells the taxpayer's name does not make the notice ineffective, 26 U.S.C. § 6323(b)(1) protects a purchaser of "securities" including cash [from as-

sertion of the lien] when the purchaser has no actual knowledge or notice of the existence of the lien.

*Id.* at 1160. In other words, one who receives money that is subject to a tax lien cannot have the lien enforced against her, unless she actually knows of the lien's existence. This protection is wholly unavailable to a purchaser of realty, who is charged with constructive notice of a lien if it is properly recorded. *See* 26 U.S.C. § 6323(a), (f). In light of this difference, *Fritschler*'s constructive notice discussion carries less weight.

The plaintiffs' argument, besides lacking support in the case law, has a second serious problem: it is logically contradictory. The name-only/cross-reference argument implicitly concedes that an index searcher would *always* have to look beyond those entries bearing the exact name sought, because cross-referencing information such as addresses would be helpful only where examined cards have *incorrect* taxpayer names. If a searcher were to find a card with a perfectly matching name, cross-referencing information would be irrelevant; the lien would be discovered. On the other hand, if the searcher were to find a technically non-matching name, he or she would have to look at *other* cards to see if non-name information matches. This logical difficulty seriously undercuts the plaintiffs' contention that one need look no further than exact names on cards to reasonably inspect an index.

In light of all the case law, this Court concludes that the first notice, as filed by the IRS and indexed in the Marion County federal tax lien index, substantially complied with the requirements of § 6323. Accordingly, the plaintiffs had constructive notice of the first lien, and the lien is valid and enforceable against them.

### C. *Priority*

Determining that the tax lien is valid does not end the inquiry, however, because the plaintiffs still claim to have rights in the property superior to those of the government. Their argument runs like this: ISC's mortgage did not merge with the property's legal title when ISC bought it at the foreclosure sale. Instead, the lien was preserved so that ISC could assert it against any junior lienholders who inadvertently were not joined in the foreclosure action, and who consequently might try to "step up" and foreclose against ISC. When the plaintiffs bought the property, they became "equitable assignees" of ISC's preserved mortgage interest. Therefore, they may assert ISC's lien against any omitted junior lienholders, including the government. This argument, because it deals with the nature of the parties' interests, must be examined according to state law. *Aquilino v. United States*, 363 U.S. 509, 512–14, 80 S.Ct. 1277, 1279–81, 4 L.Ed.2d 1365 (1960); *United States v. Brosnan*, 363 U.S. 237, 240–42, 80 S.Ct. 1108, 1110–12, 4 L.Ed.2d 1192 (1960); *Tompkins v. United States*, 946 F.2d 817, 819 (11th Cir.1991); *First American Title Ins. Co. v. United States*, 848 F.2d 969, 972 (9th Cir.1988); *United States v. Polk*, 822 F.2d 871, 874 (9th Cir.1987); *see Southern Bank of Lauderdale County v. Internal Revenue Serv.*, 770 F.2d 1001, 1007 (11th Cir.1985), *cert. denied*, 476 U.S. 1169, 106 S.Ct. 2890, 90 L.Ed.2d 977 (1986).

### 1. Merger

In Indiana, a mortgagee's acquisition of fee simple title to mortgaged property generally results in a merger of the mortgage with the title, thus extinguishing the mortgage lien. *Ellsworth v. Homemakers Finance Serv., Inc.*, 424 N.E.2d 166, 168 (Ind.Ct.App.1981). Merger will not occur, however, and the lien will be preserved, where merger would harm the interests of the mortgagee. *Id.* (citing *Swatts v. Bowen*, 141 Ind. 322, 40 N.E. 1057 (1894)); *see Zilky v. Carter*, 226 Ind. 396, 402–03, 81 N.E.2d 597, 599 (1948); *Evansville Gas–Light v. State*, 73 Ind. 219, 222 (1881). The key factor in deciding if merger has occurred is determining what the parties to the sale—primarily the mortgagee—intended. *Ellsworth*, 424 N.E.2d at 168. If intent is not express, but circumstances indicate that preservation will "benefit" the mortgagee, the court will presume that no merger was intended. *Id.*

(citing *Egbert v. Egbert*, 226 Ind. 346, 80 N.E.2d 104 (1948)).

The underlying purpose of this "anti-merger" rule—i.e., the benefit it is meant to confer—is protection of the mortgagee's priority. Specifically, the rule allows the mortgagee to prevent junior lienholders from stepping up in priority, foreclosing, and reducing the mortgagee's already-diminished recovery, because it bars all but the mortgagee from re-foreclosing or reselling the property, and guarantees the mortgagee's priority in any proceeds. *Ellsworth*, 424 N.E.2d at 168 ("[t]here would be no reason to prevent merger except to foreclose the mortgage, if necessary, to protect the mortgagee's interest"). Put simply, the anti-merger rule gives a mortgagee first crack at any money generated by foreclosures on the property, ahead of any junior lienholders, until it has been paid what it is owed in full.

In this case, there is no clear evidence that ISC intended for there to be no merger, but the circumstances clearly support an inference of such intent. To borrow the language of the Tenth Circuit:

> By purchasing the property at the auction, the [mortgagee] intended to protect its lien, and perhaps junior lienholders, by preventing the property from being purchased at below market value. It would be an absurd result to conclude that the [mortgagee] intended to destroy its own lien ... by taking action that arguably benefitted junior lienholders. Absent evidence to the contrary, we therefore presume that the [mortgagee] intended to preserve its lien.

*United States v. Colorado*, 872 F.2d 338, 340 (10th Cir.1989).[10]

**10.** The government attempts to draw a distinction between cases involving judicial sales, which it claims "invariably divest or extinguish the liens of all parties to the action," and non-judicial sales, where merger may not occur. *See* Defendant's Superseding Brief at 24–25. The Court, however, is aware of no cases (and defendants have cited none) that relied on this distinction. Moreover, it appears that Indiana courts might act to preserve a mortgage in equity even where the foreclosure sale is judicial (i.e., ordered by a court). *See, e.g., Watson v.*

## 2. Transfer of the Mortgage–Assertion Right

This leaves one crucial question to answer. Did ISC's ability to assert its mortgage against junior lienholders pass to the plaintiffs when they bought the property? There is apparently no case on point, but this Court is constrained to answer "no." Initially, Indiana cases seem to hold that the anti-merger rule is designed to benefit only the foreclosing mortgagee who is a party to the original sale; the law says nothing about subsequent transferees. *See Ellsworth*, 424 N.E.2d at 168; *see also Swatts*, 40 N.E. at 1058 (purpose is to "prevent[] injury to the interests of *the parties to the transaction*") (emphasis added); *Hanlon v. Doherty*, 109 Ind. 37, 9 N.E. 782, 785 (1887) ("[i]t is presumed ... that *the party* must have intended to keep on foot his mortgage title when it was essential to *his* security") (emphasis added). Moreover, the rule, as noted above, is meant to give the mortgagee first crack at a full recovery, and this is exactly what ISC appears to have gotten when it consummated the sale to the plaintiffs.[11] After this sale, ISC no longer had any interest in the property to protect, so there was no reason for its mortgage-assertion right to pass to the plaintiffs.

The plaintiffs rely on *Oldham v. Noble*, 117 Ind.App. 68, 66 N.E.2d 614 (1946) in arguing that ISC's right did indeed pass to them. In that case, Selig bought property from Iverson, and conveyed a mortgage to him. Selig then conveyed the property to Walker for life, with the remainder to Walker's daughters. Iverson then foreclosed on the mortgage, joining Selig and Walker as defendants, but he failed to join Walker's daughters. Iverson bought the property at a sheriff's sale, then sold it to

*Strohl*, 220 Ind. 672, 691, 46 N.E.2d 204, 211 (1943).

**11.** The sheriff's deed issued to ISC shows that it paid $49,000 for the property at the foreclosure sale. *See* Amended Complaint, Ex. H. The title insurance policy issued by Chicago Title Insurance Company indicates that the plaintiffs paid the same amount to ISC on July 1, 1987. *See* Plaintiffs' Superseding Brief, Ex. E.

Noble, who believed that he was getting a fee simple. Later, Walker died, and his daughters sued Noble for possession.

The court held that Walker's daughters were fee simple owners of the property, because the foreclosure action had no effect on their remainder interest. In effect, Iverson had purchased (and conveyed to Noble) Walker's life estate, and nothing more. However, the court also held that Walker's daughters were still liable on the debt secured by the mortgage. Therefore, in order to prevent unjust enrichment to the daughters at Noble's expense, the court held that Noble, as the "equitable assignee" of Iverson's mortgage, could foreclose against the daughters and recover part of what he paid Iverson. *Oldham*, 66 N.E.2d at 617–18.

*Oldham* does have similarities to this case, but it differs in one dispositive respect. The parties against whom the mortgage was asserted in *Oldham*—Walker's daughters—actually were liable on the underlying debt. As a result, failing to allow Noble to enforce Iverson's mortgage "would [have] len[t] sanction to an unjust enrichment of the [daughters'] estate at the expense of others [i.e., Noble] ... by virtue of their own default in an obligation they justly owe." *Id.* Here, by contrast, the party against whom the plaintiffs want to assert the mortgage—the government—owes nothing to anybody, and is not in a position of being unjustly enriched. Therefore, the equitable concerns addressed in *Oldham* are not present here, and that case does not control.

In sum, the Court holds that ISC's mortgage was preserved after it bought the property at foreclosure, but holds further that ISC's right to assert the mortgage against junior lienholders did not pass to the plaintiffs when they bought the property. As a result, the government's lien has priority.

## IV. CONCLUSION

For the reasons discussed, the government's motion for summary judgment is GRANTED, and the plaintiffs' motion for summary judgment is DENIED. This cause is DISMISSED WITH PREJUDICE.

SO ORDERED.